Hemphill, O. J.
The provisions of law regulating the rights of parties to administration was, at the commencement of this suit, found in the first section of the “Act regulating the duties of probate courts,” etc.; approved 5th February, 1840 (Laws, vol. 4, p. 110); and is in the following terms, viz.: “That when any person shall die intestate the executors named in any testament shall renounce the exec-utorship or refuse or neglect for the space of thirty days after the death of testator to exhibit such a testament for probate, then administration of the succession of such intestate or such testator, with the testament annexed, shall be granted- — -first, to the surviving husband or surviving wife; then the next of kin of such intestate or testator, or one of them,” etc.
During the progress of the cause in the lower courts, the statute containing the above provisions was repealed, but the present one on the subject contains substantially a similar regulation.
The appellant contends that the marriage between the appellee and the deceased was null, on the ground that at the time of their marriage the deceased, as the appellant alleges, had a lawful wife living in the state of Missouri, one of the United States of America, and that the appellee having never been lawfully the wife cannot claim administration as the surviving wife of the deceased.
The questions arising in this controversy in their natural order are, 1st. Whether there is any sufficient legal proof of the former marriage alleged to have been -celebrated between the deceased and the mother of the appellant; and, *
2d. Whether, if the former marriage be established, and also the existence of the wife at the time of the celebration of the latter, the appellee is not nevertheless, under the laws of the land, to be re *(438) garded as the lawful wife of the deceased and entitled as such to all the rights and privileges of a surviving wife.
An attempt was made to establish the former marriage by proof of the cohabitation, of the parties, and also by evidence of its solemnization by a justice of the peace, an officer duly authorized, as is con-tendejj, by the laws of the state of Missouri to celebrate the rites of matrimony. Whatever force may be given to evidence of cohabitation and repute as establishing a domestic marriage in countries governed by the common law, yet we cannot permit the establishment- of a foreign marriage on such "evidence in our courts, in cases where it would operate to the ann ulling of a marriage, celebrated here according to the laws of the country, and to the destruction of all the rights of the innocent partner and the offspring of the latter marriage; and this will especially not be regarded as competent proof, when from other facts adduced it is apparent that marriage in the foreign country of its celebration is considered not only as a contract which can be consummated by the consent and cohabitation of the parties, but as one the solemnization of which is regulated by special laws and is celebrated, as in this instance, by an officer of the government — assuming to himself authority for that purpose. From our knowledge of the laws or at least the customs and usages of Spain, we know that cohabitation between single unmarried persons is tolerated to a great extent in Spain and Mexico; and to admit such evidence as competent proof of a foreign marriage, without any knowledge of the laws or usages regulating the marriage union, would be unwarrantable and dangerous to the rights of our citizens, growing up in good faith under the laws of the country.
Hor are we of opinion that the foreign marriage was sufficiently established by the evidence adduced of its actual solemnization. This consisted in a certified copy, from the office of the recorder of Halls county, state of Missouri, of a certificate under the sign manual of a justice of the peace that he had; on a certain day in 1822, solemnized according to law the marriage rite between the deceased and one Harriet. Stone. Admitting that this record is authenticated according to the act of congress of 1834, and that it should have, therefore, such faith and credit accorded to it in our courts, as by the laws and usages of the state of Missouri it has in the courts of that state; yet, having no knowledge of the laws and usages of that state relative to the subject-matter, we cannot determine the faith and credit to which this office-copy of the record may be-entitled. The form, validity and effect of the record and of the probate, if any be required, must depend on the provisions of some local statute, and this should have been *(439) proved before the competency or force of the evidence could be determined. We cannot judicially know, without proof of the law, whether such an instrumeut is authorized to be recorded ■ — ■ nor the legal effects of the production of a copy of such a record in a court of justice. Before it can be admitted as competent evidence to establish a foreign, to the dissolution of a domestic marriage, and to the destruction of the rights of the innocent partner and offspring of the latter, the proof of the statute authorizing the registration of such a certificate and the effects of such a record as evidence is indispensable. See Bryan v. Kciton, decided at this term of the court.
If the production of the certificate were for the purpose of proving the solemnization of a foreign marriage, according to the laws of the state of Missouri, it became necessary that proof of the laws of that country should have been made. See 2 Stark. 510; 4 Phil. 209.
But, granting that the foreign marriage was fully established, we are of opinion that the claim of the appellant to the administration cannot be sustained.
•The record shows that on the 22d day of February, 1830, all the formalities, rites and ceremonies having been duly observed, and proclamation having been made on three festival days, according to the ritual of the holy apostolic Catholic church, and no impediment having been made, the deceased and the appellee were married, in facie ecelesice, by the actual priest of the city of San Antonio.
This marriage was not impeachable for the want of any formality, but was in full compliance with the laws regulating the marriage ceremonial, and if made in good faith on the part of the appellee, imposed upon her all the obligations, and invested her with all the rights of a lawful wife, so long as she continued ignorant of any annulling impediment on the part of her husband, which would dissolve such a marriage, although such an impediment might have, in fact, existed.
The second marriage having been contracted before the introduction of the common law, the rights and obligations flowing from it depend on the principles of Spanish jurisprudence, and we have been referred to authority to support the position that the appellee under the circumstances of this case is, under the laws of Spain, entitled to all the rights of a lawful wife of the deceased.
Among 'other authorities we have been referred to law 1, tit. 13, Partidas, 4.
This law treats of the legitimacy of children, and declares that although there exists an impediment, for which a marriage should be dissolved, yet the children begotten before such impediment is known will be legitimate; and this, as well where both of the spouses are *(440) ignorant of the existence of such impediment, as where only one of them knew it, for the ignorance of one of the spouses alone will render the children legitimate. But after they knew with certainty the existence of such an impediment, those that they afterwards have will not be legitimate.
This law in its terms extends only to the legitimation of children whose parents, or one of them, have the misfortune through ignorance to contract marriage during the existence of an impediment which would annul such provision; but the spirit of the provision would extend the same protection to the innocent parent as to the innocent offspring. The beneficent object of the legislator was to shield the offspring from the consequences, not of vice, but of ignorance on the part of the ancestor; and, if this ignorance onerate as innocence, and convert an unlawful into a lawful act f.or the benefit of the child, it should exert the same benign influence on the rights of the parent who was in' no fault. The reason of the law is the same in both cases, and this legal provision is not one of that class which, from their terms, objects, limitations or provisions, cannot be extended beyond the case specially relieved, but of that class which embraces all who have substantially the same merits, and between whom the discrimination would be odious, partial and unjust. The legitimation of the children should be considered as only one of the effects of the innocence of the parents, and not as precluding the parent herself, whose claim is equally as strong, from all benefit on the same grounds.
It should be remembered that we are in a great measure destitute of authentic collections of the former laws of the country.
The edition of the Partidas that is in common use is very incomplete; and we are altogether without the compilations of the laws introduced since the adoption of that code. We find, it is'true, some scattered and detached fragments of these laws in other works, and from two or three commentators we can glean the substance of such of them as are referred to in these writings, but they are in so condensed a form, as to frequently present but very vague and unsatisfactory information.
Were all of these laws accessible, some positive regulation would doubtless be found, which would convert the ignorance of the parent into a shield, covering with the like protection both the parent and child, and under whose shelter the rights of both would be alike sustained against all assaults from whatever quarter. But though the rational inference from the law in the Partidas would lead to the conclusion that the benign spirit of that provision had been extended also to the protection of the innocent and honest; yet, we are not left *(441) to unaided construction or to rules of exposition, however just, to sustain this extension of the salutary provision. In the “El Diccion-ario de Legislación,” we find the rule above,- deduced from the spirit of the law in Partidas, so fully, precisely and positively laid down by this eminent writer, that we can have no doubt of its existence as a principle of Spanish jurisprudence.
In this work, putative matrimony is defined to be a marriage which, being null on account of some dissolving impediment, is held, notwithstanding, for a true marriage, because of its having been contracted in good faith, by both or one of the spouses being ignorant of the impediment. Good faith is always presumed, and he who would impede its effects must prove that it did not exist. To make the good faith perfect, it is necessary that the marriage should have been celebrated with the prescribed solemnities, that the spouses may have been ignorant of the annulling vice and that their ignorance be excusable.
Even after such marriage is annulled, it produces the civil effects of true matrimony, as well with respect to the spouses as with respect to the offspring.
The interests of the consorts at separation will be regulated according to the disposition which would have been made of them, in cases of dissolution by death or divorce. This good faith produces its results as long as it continues and when it ceases, its effects also cease.
To illustrate the principles of the law on this subject, this jurist refers to a case identical in its circumstances, with the marriage between the deceased and the ajipellee: He says that if good faith does not exist except on the part of one of the consorts, it seems natural that this matrimony should not produce its civil effects, except in favor of this consort and of the offspring of the marriage.
“The man, for example, conceals his first marriage, and marries with another woman ignorant of the fact — -this connection is annulled, but the woman having acted in good faith shall enjoy the civil rights of a legitimate wife, as well with respect to her children, as with respect to her husband- — and the children shall enjoy all the rights of legitimacy, with respect to both of their parents, but it seems uujust that the husband,” etc. Again, “Putative matrimony may be converted into a true marriage, if after the celebration, the impediment ceases to exist. In the case for example that a man be married to a second wife, living the first, if afterwards this one die, the second wife, who was ignorant of the first marriage of her husband, may, at her pleasure, select either to live with him or be separated and marry another.”
*(442) A full and complete translation of the article has not been attempted, but only the substance of such portions as are more immediately applicable to the circumstances of this case.
The court of Louisiana has held, on a similar provision in their code, that where a woman was deceived by a man who represented himself as single, she, and her children born while the deception lasted, are entitled to all the rights of a legitimate wife and children. Clendening v. Clendening, 3 Mart. (N. S.) 438.
In this case there was no attempt to prove that the appellee had, at the time of the marriage, or at any time before the death of her husband, or even until the question of administration was agitated, any knowledge whatever of the former alleged marriage.
The deception practiced upon her appears to have been complete.
Her faith in her husband appears never to have been disturbed with suspicions of former infidelity to the marriage relations, or with doubts of his treachery (as alleged) to a former partner in matrimony; a certain knowledge of which on the part of the appellee, at the time of her marriage, would have covered her with the shame of an adulterous connection, and degraded her in legal contemplation below even the level of the concubine.
There was not only no proof of any knowledge on her part, but, were presumptions at all admissible as against the good faith of the appellee, they wonld, if suffered to be raised from the facts as proved, not operate injuriously to the appellee, but would, instead of proving her knowledge, manifest her ignorance of the existence of a former marriage or wife.
The first marriage was celebrated in a remote foreign country, between which and this there existed at the time but little intercourse, and more especially with San Antonio, the place of the latter marriage — a city wdiose inhabitants were then almost exclusively Mexicans, and had seldom intercommunication with foreigners. The movements of the deceased between 1823 and 1830 are not established; but from the fact of his being found at the latter period, in San Antonio, we may conjecture that he had resided there for several years. Residing here under a change of name and claiming to have been from North Carolina — another foreign country, remote both from Texas and from the state of Missouri — fit was almost impossible that the appellee could on inquiry — had her suspicions been aroused — have obtained any satisfactory information as to the former condition of her husband in Missouri, while she was altogether ignorant of the fact of his domiciliation in that state. There is not *(443) then a shadow of probability that the appellee had at any time heard of the former marriage.
If presumptions might arise that this fact was ascertained after the arrival of the first wife in Texas, yet this wife was married to another man before her emigration to this country.
As innocence is always presumed, it is not to be supposed that the first wife remarried without having obtained a divorce.
If the appellee ever heard then of the existence of the first wife, it was only as one from whom her husband had been divorced, and between whom the marriage had been utterly dissolved. Had it been ever proven that the appellee had received certain information of the existence of the former wife, yet after her marriage the fact thus qualified would not affect her claim or disturb her rights as a lawful wife of the deceased. In the article quoted from the dictionary, it is laid down that putative may be converted into true matrimony, by the impediment ceasing to exist, and the instance given in illustration of the rule would be identical with this case had the former wife died instead of being divorced, as is to be presumed from her remarriage; but the rule is as applicable in the one case as in the other. The former marriage is as completely dissolved (at least it is so by the laws of this country) by divorce as by death, and the putative is converted into a real marriage by the removal of the disability, however that may be effected. According to the instance given, the second wife on the death of the first has the privilege of remaining with her husband as his lawful wife or of separating and marrying another.
This pi-ivilego should be accorded as well where the first marriage is dissolved by divorce as by death.
But presumptions cannot be admitted to any extent to impeach the good faith of the appellee. If by knowledge of the former marriage she is to be divested of her rights and exposed to humiliation, this marriage must be established on clear and indisputable proof, and not on presumptions susceptible of explanation, if there were any arising out of the facts in the case; and we have only alluded to the doctrine of presumptions, to show their inadmissibility in a controversy of a similar nature, and not as necessary to the decision of the present casé.
There are here no presumptions that the ignorance of the appellee was ever enlightened, that the darkness enveloping her husband’s conduct was' ever dispersed- — or that her mind was crossed with a shadow of suspicion that she was not in law, morals and religion the lawful wife of the deceased; she is innocent then of any offense morality or against the rights of the former wife.
*(444) She has been subjected to all the duties and obligations and is entitled to all the lights of a bona fide wife. Her ignorance and her innocence continued through the life of her husband. She was in life his lawful wife, and if terms are used in their ordinary or legal import, she must after death be his surviving wife. The appellant’s counsel has contended in a very ingenious argument that, though she might under the law existing at the celebration of the marriage be entitled to a portion of the property, yet by the laws in force at the time of his death, she could not be regarded as the surviving wife of the deceased.
That the order of administration is an arbitrary, legal regulation, and that the surviving wife, to whom administration is granted, was only one who, in contemplation of the common law, was the lawful wife of the deceased. The extreme pressure under which our opinions are made up will prevent any full discussion of these and other points raised in the argument, even of such as may be essential to the decision■ — -we will however briefly remark that the rules of law deduced from Spanish commentators' by the appellant are modified by other rules and principles, as laid down in the authorities to which we have referred.
And that, although the common law may not, as is contended, without some statutory modification, recognize the validity of a second marriage (the first wife living) under any circumstances or the rights of the ignorant partner or of the offspring, however innocent— yet this marriage, being valid at the time of its solemnization, continued so under the laws of this country as long as the appellee was not certavnh/ informed of the first marriage; and after the dissolution of this by divorce, as is to be presumed, the second marriage, by the removal of all impediment, became a true marriage and was relieved from all taint of illegality. The marital rights of persons in this state, married before the introduction of the common law, are to be regulated by the law as it aforetime was.
If then by the former law the appellee is and was regarded up to the death of the deceased as his lawful and bona fide wife, it would surely be no misnomer to style her after his death his surviving wife. It is true that the order of granting letters of administration, as now regulated, was established since the common law -was put in force — but when application is made by a wife for authority to administer the succession of a deceased husband and her status is disputed, we must have recourse, not to the common law alone, but to all the laws regulating her condition, to ascertain whether she is entitled or not in the capacity in which she sets up her claim.
*(445) If by those laws she is regarded during the life of the deceased as his bona fide wife, and as such entitled to all the rights of a lawful wife, she must, if she survives him, be regarded as his surviving wife, and be invested with all the rights devolving on her in that capacity, one of which is the authority first in order to administer on the estate of the deceased liusb&nd.
She lias a larger interest in the property than any other person. ■ The matrimonial connection had continued for fifteen years, and she is in her own right entitled to one-half of the balance of the community property remaining after the payment of the debts, if there be any, by which it is incumbered. She is the natural guardian of her children, and there is every consideration to give force to her claim for administration, and to secure a faithful and careful discharge of the duties of the trust.
Other questions of importance connected with the general principles regulating conflicting claims between foreign and domestic marriages, and the protection which would be afforded rights accruing in good faith under our own laws, readily suggest themselves to the mind, but it is impossible under the circumstances to give them any consideration. '
It is ordered, adjudged and decreed that the judgment of the court below be affirmed.