RACHAEL NICHOLS v. CHARLES A. STEWART.

CHARLES A. STEWART AND OTHERS v. ARTHUR SWIFT.

In this case some of the defendants appealed, and the plaintiff brought a writ of error, in same Transcript.

Where an Act of the Legislature declared certain former marriages, according to the custom of the times, legal and binding and the issue legitimate, it was held that the Act gave to such marriages the same effect as if they had been solemnized according to the law in force at their date, one of which was to make legal heirs of the children of the parties (acknowledged by the father) born before the marriage.

In 1832 A and B contracted marriage by bond, and lived together a few months; in 1834 C and B living together as man and wife, and having a child about six months old, contracted marriage by bond, A and B having a short time before cancelled their bond; a short time afterwards C, while living with B, as man and wife, died; on the 16th January, 1836, the Consultation decreed all marriages theretofore celebrated by bond or otherwise, under the heretofore existing laws, to be valid; on the 5th June, 1837, the Legislature legalized all previous marriages according to the customs of the country, by bond or otherwise, where either the husband or wife had died previous to the passage of that law, provided the parties lived together as man and wife at the said death of either party; Held, That the second marriage was legalized, and, the child being proved to be the issue of C and B, that she was legitimated as such.

Where heirship to the grandfather by the father's side, was claimed through an Act of legitimation passed after the death of the father but before the death of the grandfather, an objection by the other heirs of the grandfather, that the Act was retrospective and therefore void, was not noticed by the Court.

A conveyance by the husband and wife, of all the right, title and interest which they had, in and to the estate of a former husband of the wife, then in course of administration, was held to include the rights of the wife to the one-half of the residue of the community property after the payment of the debts charge-

able against it; more especially, as the wife, at that time, (1845,) had no right
to any part of her deceased husband's separate estate.

Where the authentication of a wife's deed, in the attestation clause, omitted the
word "seal" before the words "of office," it was held to be immaterial.

See this case as to mistakes in the authentication of conveyances by married
women.

Appeal and Error from Guadalupe. The marriage bond of
Frederick Roe and Sarah Grogan was executed by them before
an Alcalde at Gonzales in November, 1832, and was filed by
him in his office, among the archives of the municipality of
Gonzales, and is now on file in the office of the Clerk of the
County Court of Gonzales county. John Sowell died in 1837,
after the passage of the Act of the 5th of June of that year,
leaving several sons surviving, whose rights were represented
in this suit. Roe died in 1837 or 1838. The other facts ap-
pear in the Opinion.

*J. Ireland,* for Rachael Nichols. The language of this deed
is exceedingly vague. It is about in these words : Convey
to A. W. G. Davis all our interest in the estate of John Sowell.
The estate of John Sowell was then open, and was not closed
until about the year 1849. Mrs. Nichol's interest, or her title
to her portion of the community, was as high and held in and
by as complete fee simple title as did the husband in his life-
time. (Wright v. Hays, 10 Tex. R. 130.)

To hold that this deed conveyed Mrs. Nichol's own property
would be to make a new contract for the parties. (Malone v.
Mayors, 8 Humph. R. 577.)

A deed to property acquired in a particular manner, will
only convey that acquired in that particular way. (Wilkens
v. Burton, 5 Vt. R. 76.)

But independent of the construction of this deed, they can-
not supply the defective acknowledgment by parol. (Hayden
v. Wescott, 11 Conn. R. 131 ; Stanton v. Button, 2 Id. 527.)

*W. E. Jones,* for Stewart, and Stewart and others.   I. A

sale by the wife of her interest in her husband's estate, while the administration is pending, it is difficult to torture into anything else than a sale of whatever she may be entitled to out of the property which is the subject of administration, as her husband's estate. The proposition is almost too plain for argument. The Court in construing deeds will always give effect to the intention of the parties to them, whenever it can be done without a violation of some principle of law. In the case at bar, the circumstances under which the deed was executed, as proven on the trial, leaves no doubt as to the intention of both vendor and vendee.

II. The right of Swift to recover as vendee of Rachael Turner and her husband depends on the construction and effect given to the Act of the consultation and subsequent laws on the subject of marriages by bond.

The first Act on the subject is that of the consultation, 16th January, 1836: (Hart. Dig. Art. 24, 35.) This Act absolutely decrees all marriages by bond to be valid, with a single provision that the bond shall be filed in the office of the municipality where executed. The bond of Roe and Sarah Grogan was so filed. The first inquiry which naturally presents itself is, what is the effect upon the marriages. I insist that its effect is to legalize the marriage with Roe absolutely; and as the vendor of Swift was born during the continuance of that marriage, it makes her absolutely the legitimate child of that marriage.

The object of the Legislature in the enactment of all this class of laws, was manifestly to render those marriages valid, which were invalid only for the want of ceremony in their celebration. If Roe and Sarah Grogan, at the time they entered into bond in 1832, had been married by the priest, no one will question that the subsequent marriage with Sowell, even if it had been celebrated by the priest, would have been void.

The law supplies the place of the priest, and, eo instanti, upon its passage by the consultation, every marriage which would have been valid had the priest officiated, became valid

by the operation of the law, and every legal effect which would have flowed from a legal marriage, at the time of its celebration, immediately attached back to this marriage by bond, from the very date of the contract; one effect was to legalize the offspring, if any.

But it may be argued that the language of the law, upon its face, legalizes both marriages, the marriage with Sowell as well as that with Roe. It cannot be supposed that the Legislature intended to legalize bigamy. If children had been born under both marriages would it be for a moment contended that the law intended to legitimate them all? Such a proposition I apprehend will not be tolerated or entertained for a moment.

The first marriage was entered into in good faith; the remedial law comes in aid of such marriages. The children of that marriage, had there been any, would have been legitimated; they would have been the meritorious objects of legislative aid. Its character is not changed by the failure of such issue. The attempt to cancel the marriage bond was simply null. The remedial law acts upon the marriage, to make it good; but it does not act upon the cancellation of the bond, to give it effect. The second marriage was not made in good faith. It was contrary to good morals and propriety. It is not such marriage as ought to be set up as legal, at the expense of a former marriage, still subsisting, and which was entered into consistently with morality and good faith.

The Act of 1837 was passed under the Constitution of the Republic, which prohibited retrospective laws. At the passage of the law, Wm. A. Sowell was dead—a descent had been cast. The existing laws had declared who were his legal heirs, excluding the claimant in this case. It was incompetent for the Legislature to pass a law creating a new heir and divesting rights which had been vested under the existing laws. If William Sowell had been living at the time of the passage of the law, the case might have been different, if he recognized her after the passage of the law. Nor is the case strengthened any by the fact that John Sowell, the father of Wm. A. Sowell,

was living at the passage of the Act, for the reason that what-
ever she could obtain of his estate it must be by virtue of be-
ing heir to her alleged father.

*Paschal & Stribling*, for Swift.   The parties had a right to
dissolve a contract not at the time recognized by law.   The
Act of the Legislature only operated upon such parties as
were living together at the date of the Act under marriage
contract, or upon the issue of those who had previously died
while living under contract of marriage by bond.   We can
see no ground upon which the claim of Swift can be defeated.
That the Act operated upon the children, see Linceonum v.
Linceonum, 3 Mo. R. 310.

LIPSCOMB, J.   This suit was brought by the plaintiff, Rachael
Nichols, to recover her share of one league of land granted by
the Mexican Government to her deceased husband, John Sow-
ell.   She alleges that the several persons, named and prayed
to be made defendants, have taken possession of portions of
the said land under some pretended claim of title.

The defendants answered, setting up title derived from ad-
ministrator's sale of the estate of John Sowell, or by title de-
rived from the plaintiff herself.   Arthur Swift intervened;
claimed to be the owner by purchase from Rachael Turner,
claiming to be the grand-daughter of John Sowell, and daugh-
ter of William A. Sowell, a son of the said John Sowell, and
prayed to have the share, so purchased by him of Rachael Tur-
ner, set apart to him.   All the defendants prayed judgment,
quieting them in their respective titles.

There was a verdict of the jury, finding various special facts;
on which there was a judgment against the plaintiff.   There
was a judgment in favor of Swift, for one share of the balance
of the lands of John Sowell, after deducting therefrom the
lands sold by the administrator.   There was a judgment in
favor of those who claimed by purchase from the other heirs

of John Sowell, subject, however, to the claim of Swift for the share of Rachael Turner, the grand-daughter of John Sowell, she having been adjudged to be one of the heirs of John Sowell. And there was a judgment in favor of those who claimed title derived by purchase from the said plaintiff, Rachael Nichols. Those defendants who were affected by the decree in favor of Arthur Swift, appealed from the judgment and decree, in that only. And the plaintiff brought writ of error, to reverse the judgment and decree in favor of Charles A. Stewart.

The question, presented by the appellants, is as to the heirship of Rachael Turner to John Sowell, as the child of William A. Sowell. The appellants contend that she is not the legitimate heir of William A. Sowell, not having been born in legal wedlock between the said William and her mother. The proof shows that on the 1st day of June, 1834, William A. Sowell and Sarah Grogan entered into what is commonly known as a marriage bond. It was in proof that they lived together some time before the date of this bond, as man and wife; that they were recognized as such by the family of John Sowell, the father; that Rachael was recognized by the family as the child of William A. Sowell, and was named after the mother of the said William. It was in proof that Rachael, at the time of the execution of the marriage bond, above mentioned, was a small child, just beginning to walk. The evidence was not very precise as to her age. They lived in the family of John Sowell. It was in proof that there had been a marriage bond between Sarah Grogan, the mother of Rachal, and one Frederick Roe, entered into November, 1332, and was filed with the Alcalde of Gonzales, which bond was cancelled by mutual consent a short time before the date of the marriage bond between Sarah Grogan and William A. Sowell. It was further in proof, that Roe and Sarah Grogan lived together a short time as man and wife, the time not exactly proven, ranging from three months to eight; and it was proved that William Sowell paid Roe for a release of his claim upon Sarah Grogan, as his wife. It was in proof that William A. Sowell died a short time after

the execution of the marriage bond between himself and Sarah Grogan, and before the death of his father John Sowell.

We are relieved from discussing the question, as to what would have been the effect of such agreements to live in a matrimonial relation, on the status of the children of parties so living as man and wife, acknowledging and claiming those children as the offspring of the parties, had there been no legislation on the subject. Had there been none, it would not have followed as a necessary consequence, that the children of such parents should be bastardized (in after time, when civil society become better organized) and held to be incapable of holding as heirs to their parents. At the time that these bonds were entered into, there was no means of solemnizing matrimony, in any form recognized by the law of the land, there being no Eclesiastics to whom resort could be had, who alone, it seems, could solemnize, with the sanctions of the Church, matrimony ; and parties were driven back to the primative elements, constituting the married state : and this, no doubt, was the mutual consent of the parties. We, however, have legislation on the subject. But a recurrence to the circumstances in which the parties were placed, at the time these engagements were entered into, may not be unprofitable, in applying the subsequent legislation, to such cases.

Art. 2439, Hart. Dig., being the 2nd Section of the Act of 5th June, 1837, is as follows, i. e. : "That in cases where per- "sons have intermarried, as aforesaid, agreeably to the cus- "toms of the country, and either husband or wife had died "previous to the passage of this law, then and in that case, "all such marriages are declared of legal and binding effect, "and the issue of the same are hereby legitimatized ; provided "that such parties lived together as man and wife at the said "death of either party."

A strict, literal construction of the Act of the Congress, above cited, would, perhaps, limit the legitimatizing of the children, to such as were born after the execution of the mar-

riage bond; but that would not seem to be within the spirit and object of the law. It was designed to legalize marriages or associations of that kind, and to put it upon the same footing as if married with the legal sanction of the Church. The consequences of a legal marriage at that time, would have been to make children, the issue (acknowledged by the father) of the parties born before wedlock, legal heirs. This was the Spanish Law and Mexican Law, at the time the marriage bond was executed. The fact that the parties were living together as man and wife, at the death of either of them, seems to have been regarded by the Legislature as most important. The proof is abundant, without any contradiction, that William A. Sowell and Sarah Grogan were living together as man and wife, and that they both always claimed the child Rachael as their common offspring.

Some embarrassment has been thrown upon the question of the paternity of Rachael, from the proof that there had been a marriage bond between her mother and Frederick Roe, and that the bond between them was not cancelled, until a few days before the date of the marriage bond between Sarah Grogan and William A. Sowell; and that Rachael was at that time about six months old. The conclusion, attempted to be raised from these facts, is, that Rachael must, from her age, have been born during the time her mother was living with Frederick Roe, as man and wife. The evidence, however, will not support this conclusion. It proves that a marriage bond had been entered into between Roe and Sarah, in November, 1832; that they lived together a very short time; several of the witnesses said from three to six months. Take the longest date, and the child could not have been born, nor even begotten during that time. The evidence shows that Sarah Grogan and William A. Sowell were living together at the time of Rachael's birth, as man and wife. The bond between Roe and Sarah Grogan had no validity, and as there was no law to sanction such contract, there was none to enforce it, and it could be vio-

lated without any penalty by either party; and, with the ad-
ditional fact, that Roe never acknowledged the girl Rachael
as his child, this bond, if it had never been cancelled, would
not have been of any consequence to any one, and was not
within the provision of the Act of Congress of 5th June, 1837.
The jury, by their verdict, found that Rachael was the child
of William A. Sowell and Sarah Grogan; that she was born
whilst they were living together as man and wife. Such being
the verdict of the jury, upon the evidence, we do not find any
reason for reversing the judgment and decree in favor of her
vendee; and it is therefore affirmed.

We will proceed to examine the errors assigned by the plain-
tiff in error, Rachael Nichols.

These supposed errors consist in the overruling by the Court
below, of the exceptions taken to the reading in evidence by
the defendants, a deed made by the plaintiff and her then hus-
band, Geo. W. Nichols, to A. W. G. Davis, dated October 28th,
1845. The deed granted, bargained and sold, and by these
presents do grant, bargain and sell unto the said A. W. G.
Davis, all the right, title and interest which we have in and to
the estate of John Sowell, Sen., deceased.

The acknowledgment of this deed was authenticated by J.
M. Baker, Chief Justice and *ex-officio* Notary, and the attes-
tation clause is as follows, *i. e.:* " Given under my hand and
" of office, this 27th day of October, A. D., 1845. J. M.
" Baker, Chief Justice." The exception is first to the deed,
and second to its authentication.

It is contended for the plaintiff in error, that the deed did
not convey her community interest in the league granted to her
husband, but only what claim or interest she had in his estate.

In the settlement of the estate of the deceased, the commun-
ity property would be first liable for the payment of the debts
contracted during the matrimony, after which the wife would
be entitled to the one-half of what was left, in her own right.
The whole being liable to the payment of the debts, until paid

and a division of the community between the wife and her husband's heirs, in common parlance, the whole might well be referred to as the estate of the deceased husband ; and, when she referred to her interest in his estate, it would be well understood to be her community share.   More especially, as she, at that time, had no right to any part of his own separate estate, the deed must have had reference to the share she claimed in it as community property.

The next exception to the deed is, that it is not sufficiently authenticated by the Judge of the county, Baker, he not having certified to the acknowledgment under his seal, but under his hand and of office.   It is so evident that it was an accidental omission to put in the word seal between " and of office," that the reader would always supply the omission to make sense of the following words of office.   It was so evidently an omission of the officer, whose duty it was to make the authentication, that no one could be deceived by it, and the most ordinary understanding would have known the word seal was intended to have filled up the hiatus, that we should have regarded the exception as not sustainable.   We perceive no objection to the admissibility of the evidence of Baker, that it was an omission undesignedly made by him.   It was matter that did not affect the validity of the conveyance, nor the acknowledgment of the execution of the deed ; and as third persons were not injured, the plaintiff could not take advantage of such defective authentication, even if a third person, an innocent purchaser, could have objected.   The judgment is affirmed.

Judgment affirmed.