## JANE RICE v. CLINTON A. RICE.

In all Protestant countries marriage is almost universally regarded as a mere civil contract, subject to the control and regulation of the law of the state; nothing more is needed to constitute it a valid contract than capacity to contract, and mutual consent and mutual wills, expressed in the manner prescribed for its proper attestation and authentication.

In Catholic countries, marriage being regarded as a sacrament, it is customary to require solemnization by a priest.

It has been settled in Texas that, prior to the revolution, the ceremonies of the Roman Catholic religion had to be complied with to give validity to marriage, and if those rites were not observed the union was meretricious and without any legal sanction.

Marriages in Texas without the solemnization of the church were legalized by the ordinance of the 16th January, 1836, and the acts of the 5th June, 1837, and 5th February, 1841. (Paschal's Dig., Arts. 4662–4664, Notes 1056, 1057, 1057a.)

These acts indicate not only the existence of irregular marriages while Texas

was a Mexican province, and the necessity of some provision to mitigate and cure such social evils, but they were intended to legalize all other marriages where the parties were then living together in this relation, and to legitimate all children born of such marriages before or after the passage of these acts.

Where a man had married a wife before an *alcalde*, in 1831, with whom he lived two years and then separated from her, and was married to another in 1834, by a person without any official authority, and he continued to live with the second wife until 1857, when he deserted her and married a third, the legalizing acts of 1836, 1837, and 1841 made valid the second marriage, but not the first, and the third was adulterous. The property acquired during the second marriage was community property.

In a divorce case the jury found the facts which constituted a good cause for divorce and the marriage, but the court refused to enter a decree of divorce. The supreme court reversed the judgment, and upon the verdict and the evidence rendered a decree of divorce, and also for the partition of the property between the parties.

ERROR from Houston. The case was tried before Hon. REUBEN A. REEVES, one of the district judges.

The record in this case discloses that the defendant in error was a resident citizen of the State of Texas in the year 1830, then subject to the government and laws of the state of Mexico.

In 1830 or 1831 the defendant commenced living with one Orispy Van, in the county of Shelby, and the rites of matrimony were celebrated by one Ryan, who was reputed to be an alcalde. In about two years the defendant quit Orispy Van, and separated from her, and renounced all relation with her as his wife. In 1834 the defendant in error intermarried with plaintiff; the rites of matrimony were celebrated by a man by the name of McGee. It was not known by the witness whether he was an officer of the law or not. The marriage was then deemed valid by all, and was celebrated in the house of plaintiff's father; the defendant and plaintiff continued to live together as man and wife from the date of their marriage, 1834, until about June, 1857, and acknowledged each other, and were recognized by the community in which they lived during the

whole of that period of time, twenty-three years, as man and wife, and produced three children as the issue of the marriage. The property held by the parties at the commencement of this suit had been acquired by their joint exertions, except four or five horses, worth $50 or $60 per head, and a set of blacksmith tools, worth $100. The husband had acquired a league of land as a head-right.

*Stuart & Nunn,* for plaintiff in error.—I. The marriage of 1830 or 1831 with Orispy Van by the defendant was under the government of Mexico, whose laws required that matrimony should be solemnized by a Catholic priest, who was regarded by the laws of Mexico as the exponent of the true religion. This was a rule of internal policy which the government of Mexico had adopted to maintain the established church, and was as binding as any law of the state. (Nichols v. Stewart, 15 Tex., 230.)

II. If the first marriage with Orispy Van was illegal and ceased during the continuance of its illegality, then we insist that the defendant was not in any manner disqualified to contract another matrimonial alliance.

*William M. Taylor,* also for plaintiff in error.

No brief for the defendant in error has been furnished to the *Reporter.*

LINDSAY, J.—In this case an action for divorce and alimony was brought by the plaintiff in error against the defendant in error, alleging the marriage of the parties some time about the year 1833 or 1834; their continuous living together in that relation for a period of twenty-three years; the existence of three children as the fruits of that connection; the abandonment by the husband, and his living in a state of adultery with another woman. These

were the only material facts upon which the plaintiff's right to a decree for divorce was predicated; and if these facts were true, and legally established by the proof in the cause, the plaintiff was undoubtedly entitled to her bill of divorce. These were the only facts necessary to be alleged in the petition; and if these facts were affirmed in the finding of the jury, upon full and satisfactory evidence which was permitted to go before them by the court, a decree should have followed, as a legal sequence, and the bonds of matrimony have been dissolved.

I. But it was insisted, in defense, that there was never any marriage between these parties which was recognized by law; that the connection was merely a meretricious one, though it lasted for a period of twenty-three years, from the year 1834 to 1857, and that no marriage relation could be contracted between the plaintiff and defendant, by reason of a pre-existing marriage of defendant with another woman, which was not dissolved by divorce or death till about the year 1839 or 1840, when the subject of the first connection departed this life. The first alleged marriage took place in 1830, and was abandoned by the defendant in 1831 or 1832. The ceremonial was performed by an alcalde. No registry of it could be produced. It was proved by witnesses who professed to have been present at the time it was performed. The second took place in 1834, and was also proved by persons who witnessed the ceremonial, but who did not know the calling or profession of the individual who officiated.

II. We believe that in all Protestant countries marriage is almost universally regarded as a mere civil contract, subject to the control and regulation of the civil authority of the state; that nothing more is needed to constitute it a valid contract than mutual consent and mutual wills, and capacity to contract, to make it morally binding upon the parties; and that the law, from considerations of public policy, adds its sanction to the moral obligation by simply

XXXI—12

prescribing definite rules for its proper attestation and authentication. In Roman Catholic countries, being regarded as a sacrament, it is customary to require the presence and benediction of a priest before the consummation of the marriage, and to give it validity in the estimation of public law and in the forums of the country.

Whether the civil authority of Mexico, under the dominion of which these marriages were consummated, has ever changed or altered the law of marriage from the canon of the Partidas, as it existed before the Council of Trent, does not appear from any evidence or authority adduced on the trial of the cause; and we might very rationally infer, from the usage in Louisiana, which was once a Spanish colony, as was Mexico, that a similar usage obtained in Mexico, for a like reason—that is, that the canon of the Partidas still prevailed in Mexico—because the decrees of the Council of Trent upon the subject of marriage had never been adopted and engrafted into the civil and religious system of its government. By that rule " all that was necessary to establish a valid marriage was that there should be consent, joined with the will to marry," without ceremonies, legal or ecclesiastical, but with the obligation of perpetual union, unless some of the canonical causes for separation supervened. But a different rule has been judicially acknowledged by our predecessors in this court to have obtained in Mexico, and it has been assumed that the ceremonials of the Roman Catholic religion must be superadded to give validity to the civil contract under the Mexican laws. If so, the law of the place of contract must be appealed to for the determination of its validity. On this point we conceive we are concluded by authority in the case of Smith v. Smith, 1 Tex., 621, and Nichols v. Stewart, 15 Tex., 230, besides other cases, in which there is a distinct and unambiguous recognition of the necessity of the ceremonial rites of the church to constitute a valid marriage under Mexican law. If those rites were not observed the connection by cohabita-

tion was meretricious, and would subject the parties to the censure of the church, and they were held amenable to the infliction of various penances, or to accusations brought against them for irregularities of life and a violation of the canons.

Testing, then, each of these marriages, the first and the second, by the Mexican law, as it has been heretofore recognized by the court, neither of them had the sanction of the law of the land in which they were formed. They were therefore illegal, illicit, and meretricious, and in the eye of the civil law of the place where formed, as a mere civil relation, they had no legal sanction, however they might be regarded in the spiritual contemplation of the church. No legal obligations were attached to them, and, like all meretricious connections, they might be abandoned at the pleasure of either party; and the repentance and virtue of each could be evinced in no better manner than by a speedy abandonment. Each may be regarded as a sort of marriage *de facto*, but neither as a marriage *de jure*, until the sanctions of the political power had in some way been given to them.

The political power of Texas, after its voluntary divorce from its connection with Mexico, satisfied of the social evils that would be engendered by these irregular and illegal connections, for want of conformity to the laws of the country, which had been thus contracted before the revolution and separation from Mexico, with a wise forecaste endeavored to anticipate and prevent them, first, by the ordinance of the 16th of January, 1836; second, by acts of legislation of the 5th of June, 1837, and of the 5th of February, 1841. [Paschal's Dig., Arts. 4662 to 4664.] This action of the political power clearly indicates, not only the existence of these irregular marriages during the continuance of Texas as a Mexican province, growing out of the sparse settlements and the inconvenience and the actual want of proper municipal regulations to obviate such mischiefs, but

also of the absolute necessity of making some provision to mitigate and cure all such social evils. The ordinance and acts referred to were adopted for just such purpose, and were intended to legalize all these irregular marriages, where the parties were then living together in this relation, and to legitimate all children the fruit of such marriages, whether born before or after their adoption. Such a policy of the government was wise, humane, and benevolent, and obviated social disorders which must have been inevitable without such salutary legislation.

We are of opinion that the act of the 5th of February, 1841, unquestionably applied to the irregular marriage of the plaintiff and defendant, made it a valid marriage, and legitimated the children, the offspring of that connection, whether born before or subsequent to its enactment. The parties were living together at the date of the statute, claiming each other as man and wife, by an alliance irregularly formed, and they were clearly within the mischief designed to be cured by the statute. These parties were, then, legally married at the commencement of the suit, and that legalization of it had relation back to the time when their irregular union was first celebrated in 1834. It cannot be rationally contended that, if the second irregular marriage was legalized by this act, the first was equally made legal by it. The first putative husband and wife were not living together at the passage of the act, which was obviously the main matter within its purview. The putative husband and wife had separated when there was no legal interdict to their separation. That connection was illicit while it lasted, and never was legally authorized or sanctioned by law during its continuance. To insist now that it was thus validated by the act of 1841 is not more logical or rational than to contend that this legislation legalized every act of constupration which took place in the province anterior to the revolution.

We have thus been brought to the conclusion, that the

court erred in refusing to grant the divorce prayed for by the plaintiff. Upon the facts found by the jury she was most manifestly entitled to it. The important and material facts were found by the jury, that the ceremony of their marriage had been performed in 1834, that in 1857 he abandoned her, married another woman under a license, and that he was living with her in a state of adultery. The divorce ought to have been decreed to her.

Having come to this conclusion as to the nature and character of the relation that subsisted between these parties, the question of settlement of the rights of property involved in this relation creates no difficulty. The parties possessed comparatively but little, if any, property at the time of the formation of this marital partnership. All, or nearly all, they possessed at the institution of this suit was the acquisition of their joint labor. It was community property. It should be so regarded and so treated. The league and labor of land was acquired during the period of cohabitation. This cohabitation was subsequently elevated to the dignity of marriage by a sovereign act of legislation. It was the joint property of the espoused parties. Upon their divorce, each is entitled to a moiety of this league and labor, and of all the other property acquired during the coverture or the existence and continuance of the marital relation; and, upon the death of the father or mother intestate, the children of the marriage, born either before or subsequent to the legalization of it by the congress of the republic of Texas, will be entitled to the inheritance. Such is the nature of the decree which ought to have been made by the court below, both in reference to the prayer of the petition for divorce and the prayer for the property. In failing so to decree, the court erred. For these errors, the judgment of that court is reversed, and the decree prayed for, and as set forth in this opinion, is accordingly ordered.

REVERSED AND DECREE OF DIVORCE ENTERED.