Alice and William Cumby v. Charlotte and Jack Henderson.

No. 406.

**1. Slave Marriages.** — Alice Cumby was born in slavery, and was the daughter of a man and a woman who were married during slavery. Her parents lived together as man and wife from the date of emancipation until 1865, when they separated, and each married again. The father and second wife accumulated property, and he died intestate, and without issue by his second wife. *Held*, that Alice was a legitimate child. and entitled to recover one-half of the community property accumulated by her father and second wife.

**2. Same.**—Although at the time of her birth illegitimate, if her parents, having been married while slaves, lived together as husband and wife after emancipation, this subsequent mutual acknowledgment of the married relation should be held to complete the act of matrimony so as to make them lawfully married from the time at which such subsequent living together commenced.

**3. Marriage—Constitutional Law.**—The Constitution of 1869, providing that those married in slavery who continued to live together as husband and wife until the death of one of them, or who were so living together at the date of the adoption of that Constitution, should be considered as having been legally married, did not annul all marriages between parties who had been slaves except such as were expressly validated, but left the others to be regulated by the general principles of the laws of marriage.

ON REHEARING.

**4. Marriage Defined.**—Marriage is constituted by the agreement of two parties, competent to marry. to become husband and wife in præsenti. or an agreement to assume that relation at a future date, followed by the actual assumption of the status. and the concurrence of such facts constitutes a valid marriage, unless the law of the place requires the observance of some additional form or

ceremony, and makes void all attempted marriages not celebrated in accordance therewith.

**5. Common Law Marriage.**—A marriage good at common law is good, notwithstanding the existence of any statute on the subject, unless the statute contains express words of nullity.

**6. Slave Marriages Discussed.**—The relations existing between slave men and women when they took each other for husband and wife with the consent of their masters, was natural and moral, and not concubinage, and lacked only the legal capacity of the parties to make it lawful wedlock. That capacity came with their freedom, and then no reason existed why, if they chose, they could not invest their union with all the lawful incidents of marriage.

APPEAL from Rusk. Tried below before Hon. W. H. GRAHAM.

*J. H. Turner*, for appellants.—1. The court erred in concluding as a matter of law that the plaintiffs were not entitled to recover herein, and in rendering judgment for defendants. " The issue of marriages deemed null in law, without regard to the ground of nullity, are legitimated, and are consequently endowed with all the rights of the legitimate issue." Hartwell v. Jackson, 7 Texas, 580; Rev. Stats., art. 1656.

2. A continuing to live together as man and wife of bondsmen after the removal of their disabilities to contract marriage will be a ratification of a marriage which took place while under disability. Jones v. Jones, 36 Md., 447; Code Justinian, lib. 3, tit. 1, p. 32; Bish. on Marr. and Div., sec. 162; Brown v. Cheatam, 17 S. W. Rep., 1033; Timmins v. Lacy, 30 Texas, 136; Singleton v. Williams, 75 Texas, 655.

*Charles L. Brochfield* and *John R. Arnold*, for appellees.—1. Slaves "by the laws of bondage were precluded from the rites of matrimony." Rev. Stats., art. 2846; Timmins v. Lacy, 30 Texas, 136.

2. A bastard can not inherit from his father. Rev. Stats., art. 1657.

3. Before Alice can recover, she must show that her father and mother lived together as husband and wife during slavery, and that they continued to so live until August 15, 1870, or until the death of one of them prior to that date. Rev. Stats., art. 2846; Livingston v. Williams, 75 Texas, 655; Stewart v. The State, 7 Texas Cr. App., 328; Webb v. The State, 24 Texas Cr. App., 166.

On motion for rehearing they cited: Timmins v. Lacy, 30 Texas, 136; Sapp v. Newsom, 27 Texas, 337; Rice v. Rice, 3 Texas, 174; Nichols v. Stewart, 15 Texas, 231; Stewart v. The State, 7 Texas Cr. App., 328; Webb v. The State, 24 Texas Cr. App., 166; Damas v. The State, 14 Texas Cr. App., 468; Bish. on Marr. and Div., secs. 661, 663, 666, 668; Routh v. Routh, 57 Texas, 589; Morgan v. Morgan, 1 Texas Cr. App., 315; Jones v. Jones, 11 Am. Rep., 505; Stokes v. Swanson, 44 Ala., 633; Contelon v. Hood, 56 Ala., 519; Washington v. Washington, 69 Ala., 281;

Rundle v. Pogran, 49 Miss., 751; Jones v. Haggard, 108 N. C., 178; State v. Whaley, 10 S. C., 500; Anderson v. Simmons, 68 Miss., 733; Clement v. Riley, 11 S. E. Rep., 699.

WILLIAMS, ASSOCIATE JUSTICE. — Oscar and Bettie Garland were slaves, belonging to the same master, with whose sanction they intermarried and lived together as man and wife before their emancipation. Appellant Alice Cumby was born of this union. Her parents, when emancipated, were still living together as husband and wife, and continued to do so until the fall of 1865, when they separated. Afterwards Oscar married appellee Charlotte, with whom he lived until his death. Bettie also married again, and is still living. While living together, Oscar and appellee Charlotte accumulated the property which is the subject of this controversy. No children were born to them, and after Oscar's death appellant Alice, claiming to be his legitimate child, joined by her husband, sued Charlotte for one-half of such property.

The court below held, that there was no valid marriage between Oscar and Bettie, and that Alice was therefore illegitimate and not entitled to inherit from her father. This ruling presents the only question raised by this appeal.

Such marriages as existed among slaves were by the law of bondage treated as invalid. Timmins v. Lacy, 30 Texas, 136; Livingston v. Williams, 75 Texas, 655.

The daughter of Oscar and Bettie Garland was not therefore the issue of a valid marriage, and at the time of her birth had no capacity on this account, as well as because she was herself a slave, to inherit property. Whether the emancipation of all of the parties, by its own force and without further act upon their part, clothed the child with the qualities and capacities of a legitimate person, is a question which need not be decided in this case. There is high authority to sustain the proposition that such was the result to children born of the marriages of slaves. 1 Bish. on Marr. and Div., 163b.

In Timmins v. Lacy, supra, however, the issue of such a slave marriage, born before emancipation, was held to be illegitimate.

But neither in that case nor in the case of Livingston v. Williams did the relation of husband and wife subsist between the father and mother after their emancipation had clothed them with a capacity to contract the matrimonial alliance. In the opinion in the former case it is said: "Whether the mutual and continued voluntary recognition since emancipation of a subsisting marriage between the parties to such pre-existing permissive cohabitation during slavery does not give such connection the sanction of legal marriage, presents a very different question," and the opinion of the Supreme Court of Louisiana, deciding in the affirmative the question thus stated, is quoted with apparent approval.

Mr. Bishop says: "If the parties, having been married while slaves in the form usual among this class of persons, live together as husband and wife after they are emancipated, this, their subsequent mutual acknowledgment, should be held to complete the act of matrimony, so as to make them lawfully and fully married from the time at which such subsequent living together commenced." 1 Bish. on Marr. and Div., 162.

In the case of Livingston v. Williams, Chief Justice Stayton intimates that this rule should be recognized, unless the provisions of the Constitution of 1869 forbid such a ruling. 75 Texas, 656.

The principle thus announced has received general recognition, both by legislation and judicial decision, and we do not hesitate to recognize it as the correct rule, by which the courts should be guided, unless the Constitution and laws of the State have made a different one applicable.

The Constitution of 1869, article 12, section 27, provided: "All persons who at any time heretofore lived together as husband and wife, and both of whom, by the law of bondage, were precluded from the rites of matrimony, and continued to live together until the death of one of the parties, shall be considered as having been legally married, and the issue of such cohabitation shall be deemed legitimate. And all such persons as may now be living together in such relation shall be considered as having been legally married; and the children heretofore and hereafter born of such cohabitation shall be deemed legitimate." This rule was also declared by legislative enactment, August 15, 1870 (Paschal's Digest, article 120), was carried into the Revised Statutes (article 2846), and is still in force.

It is obvious that the marriage of Oscar and Bettie Garland is not validated by this legislation. In order that their case should fall within its provisions, the parties must either have lived together as husband and wife until one of them died, or must have been so living together at the adoption of the Constitution. But as their marriage had become complete by their voluntary agreement to live together as husband and wife, followed by cohabitation, after their incapacity was removed by emancipation, no positive act of legislation was needed in order to render it valid. The question is, did the Constitution annul all marriages between parties who had been slaves, except such as were expressly recognized by its provisions? No question as to the power to thus invalidate marriages previously valid need be considered here.

The legislation referred to undertook to declare certain marriages valid. Can it with any propriety be said that this shows a purpose to declare invalid all others which had taken place while the parties to them were slaves? To state the question is, it seems to us, to answer it. A declaration that marriages falling within a certain class shall be valid, certainly is not equivalent to saying that any others shall be invalid, unless it can

be said that the validity of one is inconsistent with the validity of the other.  Every marriage thus affirmatively rendered valid may stand without in any way affecting others which the principles of law, aside from such legislation, would uphold.

The condition of the negro population of the State, newly emancipated when this Constitution was adopted, was such as might have rendered hazardous the use of general declarations upon the subject of their marriages.  A general validation of slave marriages by legislative declaration might have been attended with consequences, pains, and penalties to the negroes which could not have been foreseen or provided against.  It was therefore, doubless, thought best to make the declaration embrace only cases where the propriety of fixing upon the parties the status of husband and wife was clear and could be attended with no questionable consequences.  Therefore only those marriages which had lasted until the death of one of the parties or until the adoption of the Constitution were treated.  All others were left to be regulated by the general principles of the laws of marriages applicable to the facts of the particular cases as they might arise.  · The law upon the subject of these marriages had not then perhaps been declared by the courts so fully as has been done in other States since then, and might have been considered to be in an unsettled condition.  The provision quoted evinces a purpose to settle all questions as to those cases coming within its terms, by giving to such marriages the sanction of the State.

It would not only be unjust, but inconsistent with the spirit of this legislation, to make it, in the effort to make valid some marriages, have the effect to annul others which by the prior law were good.  Hence we conclude that the marriage of appellant's father and mother was rendered complete and valid by the voluntary continuance of the relation of husband and wife after their emancipation.

Under a provision of the statute in force at the time, though it be conceded that appellant was illegitimate when born, such marriage of her parents, subsequent to her birth, rendered her their legitimate child, with capacity to inherit from either.  Rev. Stats., art. 1656.

Appellant is therefore entitled to one-half of the community property for which she sues, unless there are other rights in the defendant than her claim of heirship to Oscar Garland.  We can not render the judgment here with the assurance that all of the rights of the parties are protected, and the judgment will be reversed and the cause remanded, with directions to the court below to make partition in accordance with this opinion.

*Reversed and remanded.*

Delivered January 18, 1894.

ON MOTION FOR REHEARING.

WILLIAMS, ASSOCIATE JUSTICE.—We have carefully considered the motion, and have examined the authorities for rehearing cited by appellees' counsel, and have been unable to arrive at different conclusions from those expressed in our former opinion.

One of the propositions that seems to be contended for in the motion is, that no valid marriage can be contracted in Texas without a compliance with the statutory provisions which regulate the subject.

This doctrine seems to have been adopted by the Court of Appeals as formerly constituted, as the rule applicable to prosecutions for bigamy. Dumas v. The State, 14 Texas Cr. App., 166. Whether under the provisions of the Penal Code defining that offense and prescribing the rule of evidence under which it must be established, the conclusion reached by that court was correct or not, is a question with which we have no concern.

As a proposition of universal application by which the civil rights of parties to matrimonial alliances not entered into in accordance with the statutes are to be determined, we can not assent to it.

The great weight of authority in the American States which have similar statutory provisions regulating the celebration of marriages, is undoubtedly against the doctrine.

This subject has been so often and so fully discussed, that no review of the authorities will be undertaken. They are fully referred to in the citations given below.

As we understand the law on this subject, as it prevails in nearly all of the States, it is, that marriage is constituted by the agreement of two parties, competent to marry, to become husband and wife in præsenti, or an agreement to assume that relation at a future date, followed by the actual assumption of the status; and that the concurrence of such facts constitutes a valid marriage, unless the law of the place requires the observance of some additional form or ceremony, and makes void all attempted marriages not celebrated in accordance therewith. Am. and Eng. Encycl. of Law, 514, 515, 517; 1 Bish. Marr. and Div., 283, et seq.

In the latter authority the rule is thus stated: "Marriage existed before statutes; it is of natural right; it is favored by the law. Hence, in reason, any commands which a statute may give concerning its solemnization should, if the form of words will permit, be interpreted as mere directions to the officers of the law and to the parties, not rendering void what is done in disregard thereof. Consequently the doctrine has become established in authority, that a marriage good at common law is good notwithstanding the existence of any statute on the subject, unless the statute contains *express words of nullity.*"

Our statutes contain simple provisions defining what persons are not

competent to marry, and what officials and ministers may celebrate the rites; providing for the issuance and return and record of licenses, and prohibiting the issuance of licenses to persons under certain ages without the consent of their parents or guardians.   There is no provision or intimation, express or implied, that performance of any of these things shall be essential to the validity of a marriage, or that one contracted as at common law, without following these directions, shall be void.

Different language is used in the same statute with reference to marriages between persons of European blood and Africans or their descendants.   It is said, that " it shall not be lawful for such persons to intermarry; and should any person as aforesaid violate the provisions of this article, such marriage shall be null and void."

Here we have both classes of provisions in the same statute; some directing how marriages may be solemnized, but not declaring those not celebrated in accordance with such directions to be invalid; and one which absolutely prohibits marriages of a certain kind, and declares that any contracted in violation of such prohibition shall be void.   Applying the well settled rule of construction stated by Mr. Bishop to such legislation, we can reach but one conclusion.

But it is said that the history of marriages, and of the legislation and adjudications upon the subject in this State, discovers a general understanding that a compliance with some form prescribed by law is essential to the validity of the marriage, and discloses a policy that relations or connections assumed by men and women towards each other without the sanction of such a ceremonial should not be considered matrimonial, nor have the effect of marriages.

Whatever may be the weight that should be attached to deductions drawn from such a course of investigation and reasoning, furnishing, as it does, data somewhat vague and unsubstantial, a pursuance of it has, in our minds, tended to produce the opposite conclusion to that contended for.

The reference is to the " bond marriages" which prevailed in the early history of Texas, the laws passed to validate them, and the decisions of our Supreme Court on the same subject.   Prior to the declaration of independence, the people of Texas were controlled by the laws of Mexico, under which celebration of a marriage by a Catholic priest was essential to its validity, or was supposed to be so.   Lewis v. Ames, 44 Texas, 338; Nichols v. Stewart, 15 Texas, 230; Smith v. Smith, 1 Texas, 621.

The country was largely peopled by those who came from States where the common law prevailed, and had received their ideas on the subject of marriage from different laws, customs, and religion from those prevailing in Catholic countries.   They accordingly contracted alliances under bonds, assuming in this way sometimes the full matrimonial relations, and sometimes one of a temporary character.

After the people of Texas declared their independence, they showed their conviction that all such unions, effected with matrimonial intent, contained all of the essentials of matrimony, by validating them. It is urged that the mere passage of the validating acts showed that these marriages were supposed to be invalid for the lack of the observance of proper legal forms. They were supposed to be void, or at least doubtful, because of the law which prevailed when they were contracted. The common law was not in force at the time, and no question as to the effect of such connection under that system of jurisprudence existed.

This fact explains the holding in Nichols v. Stewart, 15 Texas, 226, that the connection which existed between Sarah Grogan and Frederick Roe had no validity and constituted no impediment to the subsequent union between Sarah and Sowell, which was validated by the Act of June 5, 1837, and a like holding in Rice v. Rice, 31 Texas, 174, as to the relation between Clinton Rice and Orispey Van. But the case of Sapp v. Newsom, 27 Texas, 537, was one in which the legitimacy of the offspring of one of these bond marriages did not depend upon the validating acts, as they did not apply to the case of the party as claiming as the heir of one of the parties to such a marriage. The marriage was notwithstanding held to be valid, though it was contracted under the Mexican law, and by bond merely, without the presence of the priest. The rule there enunciated is approved in Lewis v. Ames, supra, in which the connection between Mrs. Page and Potter was held not to have constituted marriage, because it was not formed and kept up with matrimonial intent.

The ruling in Sapp v. Newsom, upholding the marriage by bond, notwithstanding it was not celebrated by a priest in conformity with the law then in force, was expressly based upon the conditions of society then existing and rendering extremely difficult the procurement of a priest in many localities. An interesting and instructive account of the state and habits of society of that period is given by Chief Justice Roberts in Lewis v. Ames, supra.

We do not claim that those decisions are authority for the proposition that marriages are valid when formed merely in accordance with the common law, without a compliance with statutory regulations, when there is nothing to prevent the parties from conforming to those requirements. But it can hardly be contended that there is found in those decisions, or in the laws and habits of society out of which they grew, any policy or spirit hostile to what are generally called common law marriages.

In Robertson v. Cole, 12 Texas, 361, Judge Hemphill, after reciting the statutory provisions regarding marriage, says: "It may, however, possibly be the law—at least it may be admitted as a point not necessary to be controverted in this case—that these requisitions are but directory, and that the consent of parties over the age would, of itself, without any peculiar ceremonies or statutory formalities, be sufficient to give validity

to marriages. The statute has not in terms declared that marriages, for want of such formalities, shall be null and void.'' Again, on page 363, he says: '' Whether the marriage, as in this case, be valid at common law by consent of parties or not, yet,'' etc., and proceeds to show that the plaintiff was entitled to a dissolution of the marriage on the ground of fraud.

If marriages can only be valid when the statute is followed, what is to be the result of marriages under forged licenses, or those celebrated under mistakes as to the character of the officers or ministers who may officiate? Are the offspring of such marriages to be bastards, or to be considered legitimate only by reason of the provision of the statute of descent? Rev. Stats., art. 1656.

We can come to no other conclusion than that when our State adopted the statute regulating marriages, which substantially prevails in most, perhaps all, of the States in which common law marriages are recognized, it took it with the construction which was generally placed on it; and that when the common law was introduced, it put an end to the idea that parties could only marry by the observance of some particular course of proceeding. Of course marriages outside of the statute are not to be encouraged, but the mischiefs to society to result from such practices ought to be prevented by the infliction of penalties on those who disobey the law, and not by treating the parties as adulterers and their offspring as bastards.

Coming to the application of the law to the case, our conclusion is, that when Oscar and Bettie Garland were emancipated their incapacity to form a valid marriage was lifted from them; they were free to marry; and if we are correct in the views before expressed, it required only their mutual consent to convert their previous moral union into a legal and valid marriage. That they did so assent is found by the judge below, when he says they continued to live together '' as man and wife '' for several months after they were freed.

Cases might arise in which it would be difficult to decide whether there had been such assent and continued living together as man and wife after freedom as to make the marriage binding. We are not troubled with any such questions here, as the facts found leave no room for them.

The relation which existed between slave men and women when they took each other for husband and wife with the consent of their masters, and in accordance with the prevailing custom, can not be accurately termed concubinage. It was natural and moral, was so recognized and sanctioned, and lacked only the legal capacity of the parties to make it lawful wedlock. That capacity came with their freedom, and no further reason existed why, if they choose, they could not invest their union with all the lawful incidents of marriage.

And even if it should be held that conformity with prescribed forms is essential to marriage, there is authority for the proposition that the

marriage which had previously taken place in accordance with the custom of slave marriages would meet this rule. 1 Bish. on Marr. and Div., 162. As to this we express no opinion, however.

Before the Constitution of 1869 was ordained, facts had transpired which made Oscar and Bettie Garland husband and wife, and appellant Alice their legitimate child. We see no reason for changing our previous ruling, that if her parents at any time subsequent to her birth were lawfully married, Alice was thereby legitimatized by the operation of our statute of descent. Rev. Stats., art. 1656. We should have stated in our opinion that she was recognized by her father always. See Hartwell v. Jackson, 7 Texas, 580.

As to whether or not the constitutional provision referred to took away from the appellant her legitimacy and capacity to inherit, which, without that provision, she would have had, we will not protract this opinion in any extensive discussion of that question. Several opinions of the Court of Appeals are cited, it which it seems to have been assumed that marriages which have taken place between negroes while they were slaves must, in order to be valid, have continued until the adoption of the Constitution. In none of them, so far as the facts are shown by the reports, was a decision of the question here involved necessary, and there seems to have been no discussion of it. How far the views expressed were influenced by the rules of evidence obtaining in prosecutions for bigamy, in which they were rendered, we can not tell. As before said, we can not agree to the proposition stated when sought to be applied in cases like this. None of the other authorities referred to in the motion, so far as we can discover from a careful reading of them, militate in the slightest degree against our opinion. Several of them seem to recognize the doctrine, though generally they are based on validating acts which cover all such cases as this.

There is one decision, and possibly more, holding to a contrary view as to the effect of a continuing to live together as husband and wife after emancipation. They are referred to in the citations which we have given. We consider that they are opposed to the decided weight of reason and of authority and to the justice of the case.

An authority to guide us is, we think, found in the case of Sapp v. Newsome, supra. There had been adopted validating acts intended to cure the supposed nullity of the bond marriages; but that which validated the marriage under which the heir in that case claimed was passed after the death of his father; so that if the marriage of his father and mother was null when contracted, the descent was at the death of the father cast on other parties, and could not be disturbed by subsequent legislation. But notwithstanding several previous acts which validated other bond marriages, but not that then in question, the court held such marriage to be good and valid without the aid of any legislation, and de-

-clared the child was legitimate.   Now if the validating by the Constitution of certain marriages begun while the parties were slaves, and continued until the adoption of such provision or until death, should be held to annul all other marriages of slaves begun in like manner, but not continued so long, then equally should the validating acts of 1836 and 1837 have been held to invalidate the marriages of all persons so married who did not comply with their provisions.   But such was not the holding, and we know of no rule of construction which would require that we decide differently.

It is urged that our decision, if adhered to, will have the effect to disturb titles which have been settled under a different view of the law.   No decision of the Supreme Court has decided the question, so far as we are advised.   In each of the cases in which it was suggested by the facts, intimations were thrown out in entire harmony with the decision which we have made.   Besides, we are not advised that any different conception of the law has prevailed among the former slaves and controlled the distribution of their property.   The probability is that the legitimacy of the children of slave marriages has been generally recognized.   However that may be, we must declare the law as we understand it.

We are asked to add a finding to the facts stated in our former opinion, and we now adopt the facts found by the court below, upon which our decision was based.

The motion is overruled.

*Motion overruled.*

Delivered March 8, 1894.

Writ of error was refused by the Supreme Court April 11, 1894.