464

**CAMERON et al. v. CAMERON et al.**

No. 10324.

Court of Civil Appeals of Texas. Galveston.
Feb. 25, 1937.

Rehearing Denied March 11, 1937.

Gill, Jones & Tyler and Ansel M. Kahn, both of Houston, for appellants.

Perry & Sidman and Alexander T. Sidman, both of Houston, for appellees.

CODY, Justice.

Charles D. Cameron died intestate at Houston, seized and possessed of valuable properties, real and personal, which he and Mrs. Maude M. Cameron had accumulated while living together as man and wife. For convenience, he will hereafter be referred to as Charles, she as Mrs. Cameron.

In 1897, Mrs. Cameron was married in West Virginia to one Chapline, from whom she permanently separated in May, 1910, and never heard of him or his whereabouts thereafter for many years. In 1911, she moved to Mercer county, Pa., and there made her home with Mrs. Mary Scott, the wife of Harry Scott, and Charles' sister. Having sufficient grounds for a divorce, she employed an attorney to get it, who was recommended by Harry Scott. In Pennsylvania, the evidence shows, in a suit for divorce where the defendant is cited by publication, the plaintiff is not permitted to attend the trial unless the defendant does. In due time her attorney reported that he had secured the divorce, and she paid the fee he demanded. It was not so. He did not so much as institute the action for divorce. But this Mrs. Cameron did not learn until after the death of Charles; shortly afterwards, believing herself unmarried, Mrs. Cameron went through a marriage ceremony with Charles in Mercer county, and its validity was never questioned during Charles's life. From time to time Mrs. Cameron made extended visits to Mrs. Scott, and on more than one occasion the time of such visits coincided with the time Mrs. Foote, another of Charles' sisters and one of the appellants in this case, was visiting Mrs. Scott. Much of the time Charles and Mrs. Cameron made their home in the same vicinity as Alan Cameron, a brother of Charles, now deceased, and his wife, made theirs. Indeed, Charles and Mrs. Cameron named their son Alan for this brother—this son is now a minor and an appellee herein, suing by his mother and next friend, Mrs. Cameron. A daughter of Douglas Cameron, another of Charles's brothers who is an appellant herein, Louise Cameron, came from her home in Pennsylvania and made the home of Mrs. Cameron and Charles in Houston, hers. And after Harry Scott's death, Mrs. Mary Scott came with her two children from Pennsylvania, and they made their home with Charles and Mrs. Cameron until Mrs. Scott's death, and was cared for by them in her last illness, and after her death they reared her children—Miss Scott still lives with Mrs. Cameron, but Donald Scott is an appellant herein.

After Mrs. Cameron learned she had been deceived, that she had no divorce, and was still the wife of Chapline, she instituted this suit for herself, and as next friend for her two children who are minors, against the heirs at law of Charles, including appellants, to clear up the right and title to the property accumulated by herself and Charles, while living together as man and wife. After making findings of facts, the substance of which we have given, the court found she believed in good faith, all the time she lived with Charles, that she was his wife, and filed his conclusions of law to the effect: That Mrs. Cameron's marriage to Charles was void; but that she

was his putative wife, and as such entitled to half of the property involved; and that the two children, the issue of her union with Charles, are legitimate and are entitled to the remaining half of the property. An undivided half of the property was accordingly decreed to Mrs. Cameron, and the remaining undivided half to the two children.

Appellants do not question that Mrs. Cameron honestly believed herself divorced from 'Chapline and married to Charles, during the time she lived with him as his wife; but assert that she had no right to take the word of her attorney that he had procured a divorce, and that this was·a fact of so much moment to her, and so easy of ascertainment, that the facts on which she formed the belief that she had been divorced are inadequate to predicate the good faith essential to the status of a putative wife; that consequently her union with Charles was meretricious, and the issue of such union necessarily illegitimate.

Texas law has its doctrine of putative marriages from Spanish, not English law. Barkley v. Dumke, 99 Tex. 150, 87 S.W. 1147. But according to Bracton, in his time the common or temporal law of England recognized putative marriages. The ecclesiastical courts had jurisdiction over the marital relationship; but the temporal law had often to pass on whether a woman was entitled to dower, or a child to inherit, and was free to adopt such rules as it pleased to determine such issue, when it arose. If the question arose concerning the validity of a marriage, the question was sent for decision to an ecclesiastical court, and the answer would form one of the premises on which the lay court would found some judgment about dower or inheritance; but only one of the premises. The king's justices, though many of them were ecclesiastics, evolved the rule that a woman could not claim dower unless she had been endowed at the church door, not because marriages contracted elsewhere were not valid, but because acts which give rights in land should be public and notorious acts. Certain impediments to marriage maintained by canon law did not prevent the children of the union from being legitimate, if the marriage had been solemnized with the rites of the church, if at the time the children were begotten both or either of the parents were ignorant of the fact constituting the impediment. Bracton knew the canonist learning regarding putative marriages, and wrote it down as an indubitable part of English Law. In a passage borrowed from the canonist Tancred, he holds there can be a putative marriage and legitimate offspring even when the union is invalid owing to the existence of a previous marriage. "If a woman in good faith marries a man who is already married, believing him to be unmarried, and has children by him, such children will be adjudged legitimate and capable of inheriting." The canon law, however, was too subtle for English lay tribunals of that period; they were not given to troubling themselves about so invisible an element as bona fides. At a later date, having lost touch with canon law, they developed a theory far less favorable to putative marriages than the law of the church had been. Condensed from Pollock & Maitland, History of English Law, vol. II, pp. 374-377, Ed.1911.

■ From the review shown in Barkley v. Dumke, supra, of applications of the doctrine of putative marriages made by decisions of Texas courts, it is obvious that, if Mrs. Cameron was innocent of wrongdoing when she married Charles and believed in good faith she was unmarried when she married him and.lived with him, she has, under the laws of this state, the status of a de facto wife in relation to Charles, and, with reference to the property accumulated by them, the rights of a de facto wife; and that case further authorizes the doctrine that the status of a de facto or putative wife confers on her the same rights and burdens with reference to property accumulated by the efforts of herself and her˙de facto husband, that the status of a de jure wife confers on a woman in the community property of herself and husband. At least in this case, if Mrs. Cameron, as the trial court found, believed in good faith she was unmarried when she married Charles, then, under the authority of the Barkley Case, she must be held entitled to the property adjudged her by the trial court.

It is undoubtedly true that where a woman who has intentionally contracted a meretricious relation with a man, as was so in Walker v. Walker's Estate (Tex.Civ. App.) 136 S.W. 1145, then, only evidence that makes it clear that the unlawful cohabitation has been converted into lawful cohabitation will be accepted as establishing a subsequent change in the relationship. In the Walker Case, while married to Bell, Willie Walker took up with George Walker in the tenderloin district of Waco, and lived with him as his mistress, or meretrix. Two or three years after this meretricious relation began; Bell filed suit for divorce

in Waco, and Willie accepted service and waived citation. Two years later, though Bell's action for divorce was dismissed for want of prosecution, he told Willie he had gotten the divorce. Three years later, Willie went through a marriage with George Walker. On George's death, Willie qualified as survivor in community, and George's mother sued to recover the property as George's heir. The opinion in the case concurs with the finding of the trial court that Willie's marriage with George was not in good faith. And while she believed, from what Bell had told her, that she was unmarried when she married George, the court held that her negligence in not ascertaining the truth could not serve as a predicate on which to base the good faith necessary to make her a putative wife. During the years she knew herself to be unlawfully cohabiting with George, she was living within a few hundred yards of the courthouse, but was satisfied to accept the word of Bell alone that she was divorced.

It is not necessary to speculate on whether the result would have been different in the Walker Case, had Willie been induced to believe by Bell that she was divorced before she cohabited with George, and then believing herself unmarried, married him. She had given Bell copious grounds for divorce, and it does not appear that he had given her any. Assuming the honesty of her belief that she was divorced, it appears she continued her unlawful cohabitation with George for three years after Bell told her he had obtained a divorce. To have held, under these circumstances, that going through a marriage ceremony with her paramour, under the mistaken belief that she was divorced, based on the statement of Bell, would be to mock the doctrine of putative marriages, and the good faith on which they must be based. The case is wholly different with Mrs. Cameron. She had grounds for a divorce, and was not guilty of any acts entitling her husband to one. She employed an attorney, recommended to her by the brother-in-law of the man she later married, to get it for her. Under the law of the forum, she was not allowed to attend the proceedings, had there been such, when the divorce was granted, had it been granted. She had the right to believe the attorney was competent and honest. She had no reason to doubt that he had been successful in getting the divorce she was entitled to, when he reported that he had done so. Only after she knew of no impediment in the way of her marriage to Charles

did she marry him. Her life has been such that she is entitled to the same high respect as she would have been, had the attorney done his duty and obtained her divorce. She was Charles's devoted helpmate; and in good morals is as much entitled to share in the property that she helped to accumulate as she could possibly be, had no impediment prevented her from becoming his de jure wife. In a word, Mrs. Cameron was the de facto wife of Charles from the time she married him until his death. It was for just such a situation as hers that the doctrine of putative marriages is designed to meet. Though the issue of her union are legitimate by virtue of article 2581, R.S. 1925, they are legitimate also because they are the issue of a putative marriage.

There being no error in the judgment of the trial court, it should be affirmed, and it is so ordered.

Affirmed.