**PAPOUTSIS et al. v. TREVINO.**

No. 11190.

Court of Civil Appeals of Texas. San Antonio.

Nov. 4, 1942.

Rehearing Denied Dec. 16, 1942.

Mobley, Roberts & Lockett, of Corpus Christi, James Tafollo, Jr., of San Antonio, and Kleberg & Eckhardt, of Corpus Christi, for appellants.

Hoyo, Sharpe & Williams and E. C. Overall, all of San Antonio, for appellee.

SMITH, Chief Justice.

Gilbert Trevino brought this suit and recovered judgment against Theodore Papoutsis and his wife, Reyes Ibarra Papoutsis, who have appealed.

The obvious purpose of appellee in bringing the suit, maintained under the thin veneer of an action for divorce, was to obtain from Reyes Ibarra Papoutsis, his

claimed wife under an alleged putative marriage, an interest in certain real properties in Bexar and Nueces Counties, to which she held the admitted record title. In the count for divorce Trevino prayed for dissolution of the bonds of an alleged putative common law marriage which he sought to superimpose upon her prior and existing common law marriage with Papoutsis. No ceremonial marriage was involved, since none had been previously resorted to by either of the three involved parties to establish a marital relation. Reyes Ibarra Papoutsis was the alleged common law wife in each purported union. Theodore Papoutsis was her first and continuing common law husband, while Trevino was the superimposed putative husband. In this action Trevino obtained an annulment of his alleged putative marriage to the versatile Ibarra, as well as judgment for one-half of all property acquired by her during the period in which he shared in her divided favors.

The whole controversy makes a sordid mess which courts of equity ought to ignore, leaving the parties to lie in the bed or beds of their own making.

The record is verbose in the extreme. The pleadings cover sixty-four of the four hundred fourteen pages in the transcript; the statement of facts includes 952 pages, plus several hundred documentary, photostatic and photographic exhibits. A full, complete and accurate substance of the material testimony could easily have been encompassed within a tenth of the space actually occupied.

The suit was tried upon Trevino's fourth amended original petition, five supplemental petitions and three trial amendments, and upon nine defensive pleadings of appellants. In his fourth amended original petition Trevino complained of "Reyes Trevino, alias Reyes Ibarra, alias Reyes Ibarra Papoutsis, and Theodore Papoutsis."

The record shows that Reyes Ibarra was divorced from a former husband, one Cruz, in 1928; that thereafter she engaged in business and bought properties only under her maiden name, Reyes Ibarra; that in 1930, while a resident of Corpus Christi, she entered into a common law marriage there with Theodore Papoutsis, also of Corpus Christi, and has ever since actively and openly maintained that relation there with him. In 1940, after this suit was brought, she and Papoutsis were married in a legal ceremony.

After her common law marriage to Papoutsis, Reyes Ibarra, who will be referred to hereinafter as "Ibarra," contracted for and acquired title to four parcels of real property in San Antonio and one in Corpus Christi. These are the properties involved in this suit. Before the trial Papoutsis conveyed all his interest in those properties to his wife, Ibarra.

In the meantime, however, in 1933, appellee, Trevino, a resident of San Antonio, claims he had contracted a common law marriage with Ibarra, without knowledge of her existing marriage to Papoutsis, and that this marriage continued until late in 1939, when they separated. Trevino further claims that, as he had had no knowledge of Ibarra's existing union with Papoutsis, and upon her representation that she was unmarried, he became her common law husband, and was entitled to a community one-half interest in the said properties acquired by Ibarra, which, it was alleged, she acquired during the period of the alleged putative marriage between them. Trevino prayed for a divorce from Ibarra and a division of the alleged community property. His claims are thus described in appellants' brief, which appellee does not question here:

"* * * Plaintiff also alleged that if he were mistaken in saying he was validly married to Reyes Ibarra, he was the innocent party to a putative marriage between them, which should be declared void and he be given a share of the property alleged to have been accumulated during said marriage. He further alleged, in the alternative, that if he was mistaken in his claim that there was a putative marriage, then there was an express oral agreement that he and Reyes Ibarra would acquire property in her name to be jointly owned by them. In the further alternative, plaintiff asked that he recover the sum of $11,700 claimed to have been advanced to Reyes Ibarra for the purchase of the properties involved. Plaintiff further claims, in the alternative, that if he be mistaken in his other claims, then there was a partnership between him and Reyes Ibarra, and that he is entitled to recover his own-half undivided interest in the property."

The cause was submitted to a jury upon fifty-three special issues. The jury found all the elements requisite to establish a common law marriage between Ibarra and Papoutsis in the fall of 1930, and made like findings in support of Trevino's claimed

common law marriage to Ibarra in June, 1933, without notice to him of the existing marriage between Ibarra and Papoutsis, and in reliance upon her representation that she was not then a married woman; that Trevino contributed to the purchase of the properties acquired by Ibarra, advanced monies to her for that purpose, upon her agreement to take title for the joint benefit of both. The jury further found that Trevino advanced specified amounts to Ibarra "to be used in the purchase of the" several properties acquired by her, and title to all of which had been taken and held in her name.

The trial court rendered judgment annulling the marriage between Trevino and Ibarra, and divided the properties involved equally between them. Papoutsis and his wife, Ibarra, have appealed.

As stated, Ibarra and Papoutsis, both resident of Corpus Christi, entered into a common law marriage there, in 1930. They continued to live together there as husband and wife until the relation was confirmed by a ceremonial marriage in 1940, shortly after this suit was filed against them by Trevino. At and before her marriage to Papoutsis, Ibarra was operating and is still operating a cafe in Corpus Christi, and she conducted and still conducts all her business affairs under the name of Reyes Ibarra. Her husband, Papoutsis, was and is still in charge of a cold drink stand in a local drug store in Corpus Christi.

In 1933, while Ibarra was temporarily in San Antonio, she and Trevino, according to jury findings, entered in an agreement to be husband and wife without any ceremony, which resulted in a series of assignations over a period of years, ending in a row in 1939, whereat they terminated their alleged marital relation. After their first assignation, of short duration, Ibarra returned to Corpus Christi and continued her relation with her husband Papoutsis, as if nothing had happened. She continued to live with him as before, except for occasional assignations with Trevino in San Antonio.

It should be said here that Ibarra vigorously denied the alleged marriage agreement with Trevino, or that Trevino ever furnished her any money for the purchase of property or for any other purpose.

In various ways appellants assail the jury findings and judgment of the court thereon in support of appellee's theory that he and Ibarra entered into and maintained a putative marriage entitling him to a community interest in the property title to which was acquired by Ibarra in the course of the alleged putative marriage.

Speaking through Chief Justice Hemphill, the Supreme Court of Texas, at its first session after the State entered the Union, defined a putative marriage: "* * * putative matrimony is defined to be a marriage, which being null on account of some dissolving impediment, is held notwithstanding, for a true marriage, because of its having been contracted in good faith, by both or one of the spouses being ignorant of the impediment." Smith v. Smith, 1 Tex. 621, 46 Am.Dec. 121.

It is elemental that good faith in one or both parties is a sine qua non to a valid putative marriage.

And while good faith is always presumed, such presumption may be rebutted.

After careful consideration of the record in this case we have reached the firm conclusion that neither party to the alliance between Ibarra and Trevino acted in good faith in the transaction. It is obvious that Ibarra did not enter, if at all, into the alliance in any good faith, since she knew, of course, that she was then, and thereafter continued to be the common law wife of Papoutsis. As a witness, she vehemently denied ever making any common law agreement with Trevino, and her letters to him which were introduced upon the trial by appellee, covering the three-year period chiefly relied upon by appellee, negatived by implication, rather than affirmed any marriage relation between the two.

As for Trevino's good faith, it appears to be well settled that one asserting under a putative marriage cannot claim good faith in the absence of a ceremonial marriage attended by the formalities prescribed by law. 35 Am.Jur. p. 215, § 52; Smith v. Smith, 1 Tex. 621, 46 Am.Dec. 121; United States F. & G. Co. v. Henderson, Tex.Civ.App., 53 S.W.2d 811; Cameron v. Cameron, Tex.Civ.App., 103 S.W.2d 464; Norton v. O'Neil, Tex.Civ.App., 17 S.W.2d 66, reversed on other grounds, Tex.Com. App., 29 S.W.2d 1060. It was said by Chief Justice Hemphill in Smith v. Smith, supra, that "To make the good faith perfect, it is necessary that the marriage should have been celebrated with the prescribed sol-

emnities—that the spouses may have been ignorant of the annulling vice, and that their ignorance be excusable."

The rule stated has been modified to this extent that an unlawful alliance, such as in this case, made in the face of an existing marriage, may, if continued, ripen into a lawful union upon the dissolution of the obstructing marriage, but only in such event. Kelly v. Consolidated Underwriters, Tex.Civ.App., 300 S.W. 981; Consolidated Underwriters v. Kelly, Tex.Com.App., 15 S.W.2d 229. Of course, that modification cannot be invoked here, since the prior marriage of Ibarra and Papoutsis continued in active and continuous operation throughout the entire period of the claimed alliance between Ibarra and Trevino, was subsequently solemnized by a formal ceremony, and continued as an active relation up to the time of this trial. Under the rule stated, then, the admitted absence of a ceremonial marriage destroys Trevino's claim of good faith in entering into the marriage agreement with Ibarra, and there being no good faith on his part there could be no putative marriage. Not only was good faith negatived as a matter of law by the stated rule, but the facts of the case negative Trevino's good faith or diligence to ascertain Ibarra's status as the wife of another, as they also negative the fact of a common law marriage, regardless of its claimed putative nature. When the evidence is sifted it shows that Ibarra entered into a common law marriage with Papoutsis in Corpus Christi in 1930; that they thereafter resided and lived openly together in Corpus Christi as husband and wife continuously down through the trial of this case, except for Ibarra's occasional assignations with Trevino in San Antonio, which Trevino testified was about once a month from Monday through Thursday or Friday. There is no contention that Ibarra lived or made her home in San Antonio, or consorted at all with Trevino, except upon the occasion of those assignations. When Trevino "proposed" to her in 1933, after she had left a San Antonio hospital following a somewhat prolonged treatment for some "female trouble," they discussed the idea of a ceremonial marriage, which she declined to submit to. Upon her refusal, according to Trevino's testimony, they decided to marry upon a common law basis, and proceeded at once to a hotel to exploit the relation. Trevino neither then nor thereafter made inquiry or investigation of Ibarra's true marital status, either at Corpus Christi, where he knew she had been living and was living and operating a business; nor in San Antonio, where she was temporarily under medical treatment. He knew she had been previously and formally married to one Cruz, and had children by him, but took her word for it that she had been divorced from Cruz, which occured in 1928. He knew she had been and was still living and in business in Corpus Christi, and he was complacent about her status when she returned to Corpus Christi immediately after her first assignation with him following their agreement to proceed without a ceremony. He remained complacent through the ensuing seven years, during all of which time she lived continuously, with his knowledge, in Corpus Christi, except for their occasional assignations in San Antonio. Trevino testified that during that time Ibarra wrote him 200 or 300 letters, and upon the trial he introduced some twenty or thirty of the originals in Spanish, together with translations into English. Although the letters cover a period of three years, including 1937 through 1939, none of them contained a word expressing or implying any marital relation between the pair. She never addressed him as her husband, or spoke of herself as a wife; on the contrary, for, although she sometimes referred to him as "my life," she more often described herself as "your Mamacita," translated in the record as "a girl boy's friend." It is true she often used terms of endearment to him and expressed a desire to be with him, but those expressions were not flavored with any implications of lawful wedlock; on the contrary. It is true, too, that in a very few of her letters she spoke, always vaguely, of a time when they could be together oftener, or possibly all the time, but those references were always to remote future and dependent upon some vague and uncertain future contingency, the nature of which was not even hinted at. And when referring to their next or future assignation she was, at least sometimes, furtive, urging that precaution be taken to secure the secrecy of their assignations so that others, apparently her relatives and friends, might not discover what was going on. In short, those letters both expressly and impliedly indicated that the affair between the two was illicit and in no sense law-

ful, and as Trevino put them in evidence he should be bound by their import. On this issue of his alleged good faith the letters were certainly such as to put him upon inquiry to ascertain her status in the community in which she lived apart from him. It is obvious from the record that had he made even a casual inquiry as to her status he would have discovered that she had all the while lived, and was still living, openly, with Papoutsis as his wife. We conclude that the entire record refutes Trevino's claim of a common law marriage as such, or of a putative marriage, and he is entitled to no rights incident to such status.

We come, next, to Trevino's claim to a one-half interest in all real property acquired by Ibarra, and title to which was admittedly taken and retained by her, during the period in which Trevino claims to have been her putative husband. Trevino's assertion of this interest rests upon his contention that Ibarra paid for the properties with funds advanced to her by him, wherefore he seeks to impress a parol trust in his favor upon the property, or, in the alternative, a partnership interest therein. The parol testimony directed at those issues covers several hundred pages in the statement of facts, and neither party purports to set out in detail the substance of that testimony, leaving that prodigious task to this Court. We have devoted many hours to a study of the record, but of necessity must be content to state our conclusions in general terms. Trevino's own testimony was vague, confusing, indefinite, often self-destructive, and in all aspects unsatisfactory. For example, after innumerable, uncertain and inconsistent statements as to the approximate date of his claimed marriage to Ibarra, this final and illuminating conclusion was given in his answer to an imperative question:

"Well, about the first, the first part of the year or the second part of the year, or the middle of the year, or the last part of the half of the year, or the first part."

In support of his claim that he supplied Ibarra with the money she paid as the purchase price of the properties involved, he testified, in substantial effect as follows: Over a period of thirty years in which he worked in various localities within and without the State, he gave his earnings into the hands of his brother Andreas for safekeeping, amounting to around $11,000. Andreas deposited about $4,000 of those funds in a San Antonio bank in his own name, and the remainder, in currency, he kept in the clothes closet in his home. As Ibarra would contract for different properties Andreas, at Trevino's direction, would get the required amount (in sums ranging to $3,000) from the cache in his home and deliver it to Trevino and Ibarra in a local hotel room, and Trevino would in turn hand it over to Ibarra. This was done in the presence of Andreas and sometimes of another brother who did not testify. Andreas testified at length, and while his testimony was not consistent with Trevino's in various details, it corroborated it in the main. It is not contended that those payments to Ibarra were made in any other form than in currency procured and delivered as stated. None of them were made by check, and not a scratch of a pen was adduced to corroborate the fantastic transactions. Trevino and Andreas could not satisfactorily identify the properties the purchase price of which Trevino claims to have supplied to Ibarra in this manner; he could only say that he made the money through the years as he worked at distant places, got it to Andreas in San Antonio by some means not evidenced by scratch of pen or otherwise. Andreas then took up the thread of the story and told of receiving the deposits by some undisclosed method, of lending the proceeds to various members of the family (none of whom testified in corroboration), who repaid the loans to Andreas, who stored the proceeds, aggregating over $11,000, in his clothes closet and there kept them until he turned them over to Trevino as indicated. Those are the funds which Trevino claims he delivered to Ibarra in currency for use in purchasing the properties involved. Trevino did not attempt to further trace the funds, or show their application towards the purchase of the properties.

■■ On the other hand, it was shown without dispute that through the entire period of the claimed contributions by Trevino, and for the seven preceding years, Ibarra operated a cafe in Corpus Christi, deposited her savings in local banks there as they accrued; that she personally contracted to purchase the properties, assumed the mortgages thereon when made, borrowed amounts necessary to finance the transactions, paid off the mortgages as far as they had been paid, took all conveyances in her own name. Each of these transac-

tions was shown by unquestioned documentary evidence. Her bank books were put in evidence, showing current deposits in various relatively small amounts, and withdrawals at times and in amounts corresponding with the payments she concededly made on the purchase price of the properties, and on loans she obtained to finance those purchases. The evidence was further fortified by receipts, cancelled checks, certified checks, postal money order receipts and the like, all issued from Corpus Christi banks, post office and other agencies involved in the transactions. It was still further fortified by the testimony of various persons making or carrying loans she secured in financing the purchases, and agents through whom she made or closed deals involving deferred payments. In short, Ibarra supported her own testimony that she purchased the properties and made all payments thereon herself out of the earnings from her own business in Corpus Christi, by unchallenged documentary evidence down to the smallest details. Against that showing is the testimony, exclusively in parol and not supported by the scratch of a pen, or otherwise corroborated, of Trevino and his brother Andreas concerning the former's mysterious accumulations through many years, the latter's mysterious hoarding of currency in a clothes closet through that long period, and its mysterious delivery in kind to Ibarra in a San Antonio hotel room, for the purchase of vaguely identified properties. Does this support a parol trust with that clear and satisfactory proof required by law? Not in this Court. Nor does it constitute a basis for partnership accounting, or any other cause of action.

It is deemed not out of place to insert here a copy of the last letter written by Ibarra to Trevino, after they separated, which indicates, at least on its face, that Ibarra was carrying the burden and responsibility of her properties without Trevino's help; it carries the inference that it was in answer to some sort of plea of Trevino for financial aid to himself. Whatever implication it carries, it is binding upon Trevino, who put it in evidence. The letter is as follows:

"Corpus Christi, Texas
"January 10—40

"Mr. Gilbert

"today after talking with you over the phone I tell you that the house where you live is mortgaged for a thousand, the house on Monterrey and Las Moras is for a thousand I owe on it a little and what I bought in C. C. I owe 6 thousand as it is I give 50.00 of what I owe in San Antonio and $17500. every month on my house in Corpus, right now I can not bind myself too much. You know that things can change and I will be left out on the street and I have a desire to save my house and the others so that I may have something when I can not work, to have the rents and with them I can live, I know that you may be able to pay, but right now as I am I can not do much, I am afraid when summer comes I will not be able to pay because my business slows down during the hot months, I do not think that this will displease you, you understand me that a person who has a large indebtedness as I have, will have to step very firm if I do not want to fall.

"And expecting you to be well and do not get angry for this.

"Yours,
"Reyes"

We hold, without further discussion, that the evidence in this case was not sufficient to establish a common law or a putative marriage between Trevino and Ibarra, or a trust or partnership.

The judgment is reversed and judgment will be here rendered that appellee take nothing.