## HOWARD CURTIN V. STATE.

No. 25015. December 13, 1950.
State's Motion for Rehearing Granted February 28, 1951.
Appellant's Motion for Rehearing Denied April 18, 1951.

626

*Bullington, Humphrey, Humphrey & Fillmore* and *Ralph P. Mathis* (on the brief), Wichita Falls, for appellant.

*W. M. Thacker, Jr.* Assistant District Attorney, Wichita Falls, and *George P. Blackburn,* State's Attorney, Austin, for the state.

WOODLEY, Judge.

Appellant was convicted for the wilful neglect and failure to support his three children under 16 years of age, an offense defined by Art. 602, P.C. The jury assessed the maximum punishment of two years in the penitentiary.

The defense was predicated upon the claim that appellant

was never married to the mother of the children, and that if he was in fact their father, they were not his legitimate offsprings.

The trial court recognized such as a defense, and properly instructed the jury that in order to convict appellant they must first find beyond a reasonable doubt that the children were the legitimate children of appellant. See Beaver v. State, 96 Tex. Cr. R. 179, 256 S.W. 929.

Appellant challenges the sufficiency of the evidence to support the jury's finding that the children named in the indictment were his legitimate children.

The state's witness Margaret Curtin, the mother of the children, testified on direct examination that she was married to appellant on January 28, 1931, at Walters, Oklahoma, in a ceremonial marriage; that they returned to Wichita Falls and lived together as man and wife until 1949. That five children were born of their union, a girl 18, a boy 17, and the three children named in the indictment, Marjorie 15, Iona 11 and Ronny 6 1/2 years of age.

On cross examination, however, she testified in part as follows:

"I married Howard Curtin in January, 1931 at Walters, Oklahoma. I don't have a marriage certificate. I never tried to get one until we brought this into court, three or four months ago. I did not get any results from writing to Walters, Oklahoma, for a copy of the marriage license."

"I knew he had been married before I went to Oklahoma with him in January, 1931, because I was acquainted with the family. I had seen the girl he married but I did not know her personally. * * * He said he wasn't still married to his wife and I didn't have reason to believe otherwise.

"I know now that he was a married man on January 28, 1931, the day I married him. I knew that he was a married man in 1934 because that is the time I found out the divorce had not been granted. I lived with him from January 1931 until 1934, and I found out in 1934 he was married all that time. I kept on living with him from 1934 until 1949. He stayed with me all the time when he wasn't out on jobs, working. When I found out in 1934 that he was still married, I let him keep on coming to see me. In 1934, I found out I had been living with a married man; for a while we separated and then went back to-

gether. As to any agreement, he asked that I did not say anything about the marriage because he was afraid of bigamy. * * * I knew he had misled me because he told me in January, 1931 that he was capable of contracting marriage. I thought I had married him and in 1934 I found out he had lied to me. After he told me that, I didn't make any investigation, I went back and lived with him. I know now that he was a married man and that I was never married to him except by the purported marriage ceremony at Walters. We went to Walters and were married by a preacher and we never did have an agreement other than the marriage ceremony until this case came up about his not being divorced. At that time, he said if I would keep still, in case they bring up bigamy charges, he would straighten out everything."

"We did not remarry after that; I just went on living with him just like I had every day, after I thought I was married in 1931. There wasn't any agreement of any kind other than his saying he would straighten things up and we would live together again; that is all the agreement we had."

"In 1937, when he introduced me as his wife, he was supposed to have had everything cleared up, so he told me."

"In 1934, when I found out he was a married man, he asked me not to say anything about it because I didn't want him to get in trouble as a bigamist.

"We separated for a while after that; he would come to see the children, but we were separated. I don't know when it was in 1934 that we separated.

"We started living together again the first part of 1937. I don't tell the jury that he was at my house every night because he was not in town all the time."

"After 1934, and the conversation I testified about, that I would keep quiet and wouldn't say anything, and later went ahead and lived with him, the next conversation we had after that, about living with him as man and wife, was what he told me he was going to do, get everything straightened out and do what was right with the children. After he came back in 1937, he said he would quit drinking and do what was right. He said he would just like to come home; he promised to quit drinking and if I would go on and live with him, he said he had things straightened out and I asked him if we would re-marry and he said he didn't think it was necessary.

"We only had one marriage ceremony, the one in 1931, and

I never married him after that at any time. January the 28th, 1931 was the last time we had a ceremony performed and from, then on we lived as man and wife.

"After we married in 1931, we had intercourse and we never had another ceremony; never went before a justice of the peace; I just kept on living with him after January 28, 1931 outside of the time we separated over Allene, and he did say he would go ahead and get things straightened up.

"I have told the jury everything I think would be important, to make them understand. In the eyes of God I was married to him and I had born the children by him. It was in January 1931 that I married him and I understand that I have not been married since then to him."

On redirect examination the witness testified:

"At that time I married Howard Curtin, in January, 1931, he told me he was divorced and was single and I believed him, that he was telling the truth, when I married him. In 1934, after I was told by other people first, and when I asked him he said, 'No, I'm not divorced.' After that, he said, 'I'll tell you what, in order to keep me from getting in trouble for living in bigamy, if you will let it go on like it is, be quiet, I will straighten things out.' In 1937, he did come back and told me he was straightened out and we continued then to live together as husband and wife. At the time he told me that, I already had three children."

And being recalled by appellant, the witness further testified:

"In 1934 or 1935, Howard said he would straighten it up and when he straightened it up, I was willing to live with him as his wife again. I didn't say that we would have to have a ceremony again; as I said before, I felt like in the eyes of God, we had already married. This was the last understanding or conversation we had about living together until 1937."

There was other evidence offered by the state to the effect that appellant had recognized the children as his own and had introduced the mother as his wife.

Appellant denied this and denied that he had at any time gone through with a marriage ceremony or contracted any character of marriage with the mother of the children. He of-

fered witnesses who testified that they never heard of him being married to anyone except Allene Richardson.

Appellant testified that he married Allene Richardson on September 5, 1925, and lived with her until 1930 when they separated. That this marriage relationship continued until a divorce was obtained by the wife in 1938. Certified copies of the divorce decree and of the marriage license and return were offered in evidence showing the marriage on September 5, 1925, and its dissolution by divorce on December 8, 1938.

The court defined "Legitimate Children" as follows:

"The phrase, 'LEGITIMATE CHILDREN,' as that term is used herein, means the children which are born in lawful wedlock, whether said lawful wedlock be by ceremonial marriage or common law marriage. Children born of a putative marriage as that term is hereinafter defined, are legitimate and in this connection you are instructed that where a man having by a woman a child or children, shall afterward intermarry with such woman, such child or children, if recognized by him, shall thereby be legitima*ted*."

"Putative Marriage" was defined as: "a marriage which, being null on account of some dissolving impediment, is held, notwithstanding, for a true marriage, because of its having been contracted in good faith by both or one of the spouses being ignorant of the impediment. A putative marriage is terminated by the death of either of the parties or removal of the impediment. In order to consumate a putative marriage, one or both of the parties must be innocent of the impediment there existing and must be acting in good faith at all times during the existence of said putative marriage.

"You are further charged that under the law of this State, a putative marriage may arise out of a common law marriage or a ceremonial marriage, and when and if said impediment is removed, and the parties continue to cohabit and live together as man and wife, and hold themselves out as such, said marriage becomes a lawful marriage at the time of the removal of such impediment, whether the removal of said impediment is known or unknown to the parties."

The court should not have submitted to the jury the law with reference to a putative marriage and the issue thereof, the evidence not raising such issue.

Neither of the children named in the indictment as having been neglected were shown to have been born or conceived during the time from 1931 until 1934, while the mother remained in ignorance of the impediment to their marriage. The status of a putative marriage ceased to exist when she learned of the impediment, there being an absence of good faith on the part of both parties thereafter. See Smith v. Smith, 1 Tex. 621.

The court erred also in instructing the jury that a putative marriage may arise out of a common law marriage as well as a ceremonial marriage. See Papoutsis v. Trevino (Tex. Civ. App.), 167 S.W. 2d 777, 779, wherein is found the following statement:

"* * * one asserting under a putative marriage cannot claim good faith in the absence of a ceremonial marriage attended by the formalities prescribed by law."

Appellant contends that the facts are insufficient to show a common law marriage following the removal of the impediment by the divorce decree in 1938, because there is no proof of an agreement after the removal of the impediment.

This contention finds support in the case of Brown v. Brown (Tex. Civ. App.), 115 S.W. 2d 786, cited by appellant, from which we quote:

"* * * We have carefully examined the evidence bearing on the relations between deceased and appellant after deceased's wife obtained a divorce, and are of the opinion that there was insufficient evidence of any agreement made thereafter between appellant and deceased to be husband and wife, to go to the jury. The relationship being meretricious in its inception, the evidence that it later became lawful would have to be positive and satisfactory, which it was not. Certainly the original agreement, which resulted in the unlawful living together, was not sufficient to transform their adulterous relationship into a lawful one, upon the mere removal of deceased's impediment to marriage when his wife procured a divorce."

We believe, however, that the better rule and the rule here applicable is stated in Consolidated Underwriters v. Kelly, et al. (Com. App.), 15 S.W. 2d 229, affirming Kelly, et al v. Consolidated Underwriters (Tex. Civ. App.), 300 S.W. 981, wherein the court said:

"The death of George Brown made no change in their rela-

tions. They made no new contract in relation thereto, but from October, 1925, when they reunited their lives * * *, there was no change in their relations until Joe's death in January, 1926."

And in approving the court of civil appeals' holding that these facts as a matter of law constituted Louisa the wife of Joe the court further said:

"It is undoubtedly true that the agreement for marriage, * * * so long as the legal impediment existed, was of no effect. The consumation of the marriage, however, cannot be denied for the want of agreement, but must be denied because of the legal impediment which prevented its consumation. * * * So here the facts showing that, after Brown's death, the parties continued their relations deporting themselves as husband and wife and considering themselves such, are sufficient to prove as a matter of fact that they intended their relations to be marital, and since there then existed no legal impediment, their agreement and relations were valid and lawful. Their continued living together as husband and wife after the removal of the impediment bespeaks a continued intention and agreement, day by day, to be husband and wife, * * *"

For an interesting discussion of the holdings in Brown v. Brown, supra, relied upon by appellant, and the Kelly case, see 17 T.L.R. 223.

It appears from the ages and dates stated by the witnesses that two of the three children alleged in the indictment as having been neglected by appellant were born after the impediment to the marriage of their parents had been removed by the 1938 decree of divorce. The third child, if recognized by appellant following marriage of the parents, became legitimate.

We are unable to say that the jury's verdict was not based upon a finding of legitimacy of a child or children upon the basis of a putative marriage, rather than a finding of a valid marriage becoming perfected by the removal of the impediment.

The question of the legitimacy of the children should have been confined to the question of whether born in lawful wedlock by reason of a valid marriage arising from the conduct and agreement of the parties prior to appellant's divorce from his former wife, and a continuance of such relationship following the removal of the impediment to their marriage.

And as to the child born before the 1938 divorce, the ques-

tion should have been confined to its recognition by appellant following the perfection of such common law marriage.

The judgment is reversed and the cause remanded.

Opinion approved by the court.

ON MOTION FOR REHEARING.

MORRISON, Judge.

The state's motion for rehearing directs attention to the fact that the child Marjorie testified that she would be 16 years old on July 25, 1950.

It is further correctly suggested that "it is not too clear" from the evidence admitted by the trial court whether the 11-year-old child Iona was born prior to or after December 8, 1938, the date of the rendition of the divorce decree.

That part of the original opinion wherein we said that none of the children in question were born or conceived during the time from 1931 to 1934 and therefore the question of putative marriage and the issue thereof was not raised by the evidence is withdrawn, Marjorie having been conceived prior to the year 1934.

Also, in dealing with the younger children we should have said that one and perhaps both were born after the divorce, and that if recognized after perfection of a marriage relationship by appellant the other child or children would be legitimate.

The state also contests the correctness of our holding that the trial court erred in instructing the jury that a putative marriage may arise out of a common law marriage as well as a ceremonial marriage.

A recent opinion of the Fort Worth Court of Civil Appeals, handed down since our original opinion, Fred Hupp et al v. Ann Hupp, 235 S.W. 2d 753, is cited and appears to support the state's contention. The opinion discloses that such court is not in accord with the decision of the San Antonio Court of Civil Appeals in Papoutsis v. Trevino, 167 S.W. 2d 777, cited in our original opinion.

Having reviewed the different pronouncements of the several

civil courts of the state with reference to putative marriages, we have come to the conclusion that we were in error in our original opinion, and now hold that in criminal prosecutions a putative marriage may arise out of either a ceremonial or common law marriage.

It is certainly not the thought of this court to attempt to invade, in any way, the province of the civil courts of this state on property questions. But we feel that, in cases such as the one at bar, so long as we recognize common law marriages as being of the same dignity as ceremonial ones, we should hold that a putative marriage might arise from either.

Having concluded that the charge as given by the trial court was correct and further concluding that the record discloses good faith on the part of Margaret Curtin, it follows that the state's motion for rehearing should be granted. The judgment of reversal heretofore rendered is set aside and the judgment of the trial court is affirmed.

### ON APPELLANT'S MOTION FOR REHEARING.

GRAVES, Presiding Judge.

Appellant alludes to the citation of Hupp v. Hupp, 235 S.W. (2d) 753, which case was cited by us in the opinion granting the state's motion for rehearing and affirming this cause. In that case the Court of Civil Appeals at Fort Worth, Texas, in the opinion by Chief Justice McDonald, had the following to say:

"A putative marriage based on a common law marriage relationship was sustained in Lawson v. Lawson, 30 Tex. Civ. App. 43, 69 S.W. 246, writ refused, and the Supreme Court cited Lawson v. Lawson, without a hint of criticism, in Barkley v. Dumke, 99 Tex. 150, 87 S.W. 1147. The opinion in the latter case refers to the fact that Smith v. Smith was decided under the rules of the Spanish law, and not under the laws prevailing after Texas adopted the provision of the common law in 1940. Although the precise question now under consideration is not expressly discussed in the opinion, the court in Eaton v. Eaton, Tex. Civ. App., 125 S.W. 2d 624, apparently thought that a claim of putative marriage could be based on a common law marriage."

It is the contention of the appellant that the cases cited do not bear out the statement made in Hupp v. Hupp, supra, that

is, that a putative marriage can be based upon a common law marriage.

In the first place, we do not think that the objections to the court's charge correctly called this matter to the court's attention; and in the second place, if called to the court's attention, we think the court's charge was a proper and legitimate exposition of the law.

There are many different conditions that would allow a putative marriage to ripen into a legitimate union of the parties, as for instance, that laid down in Corpus Juris Secundum, Vol. 55, pages 881-882, wherein it is said:

"The doctrine that an invalid marriage contracted in good faith, followed by cohabitation as husband and wife after the removal of the impediment to the marriage, constitutes a valid common-law marriage has been applied where the impediment to the marriage was a subsisting marriage of one of the parties, and such marriage was terminated by death or divorce; where the impediment was a judicial decree or statute forbidding marriage within a specified time after divorce, and the parties cohabited after the expiration of the specified time; or where the impediment was a disease rendering a party incompetent to marry and the disease was subsequently cured. The doctrine applies whether the initial marriage was a ceremonial or an informal, common-law marriage, although a ceremonial marriage has been held to be significant as indicating that the parties intended a matrimonial and not a meretricious, relationship."

We are of the opinion that the statement made in Hupp v. Hupp, supra, received the approval of the Supreme Court of Texas in that the writ of error was refused therein, no reversible error having been found. We are also of the opinion that a marriage is a marriage in Texas, either at common law or when ceremonially observed, provided the parties are free to contract. If one party is not free to contract but such inhibition is not known to the other party and he enters into a contract fairly, such becomes a putative marriage. The woman is a putative wife and her children born therefrom are legitimate children.

We see no need to further discuss this matter. We think the court was correct when he instructed the jury on a ceremonial marriage, also on common-law marriage, as well as a putative marriage. We also think he was correct when he further charged that under the law of this state a putative marriage may arise

out of a common-law marriage or a ceremonial marriage. We think the charge is a fair presentation of the law and see no reason for granting this motion.

The motion for rehearing is therefore overruled.