**Mary Nell DAVIS et al., Appellants,**

v.

**Nancy Kway DAVIS et al., Appellees.**

No. 932.

Court of Civil Appeals of Texas,
Houston (14th Dist.).

March 20, 1974.

Rehearing Denied April 17, 1974.

J. C. Zbranek, C. T. Hight, Zbranek, Friend & Hight, Liberty, Neal J. Iverson, Dayton, for appellants.

R. E. McDaniel, Winnie, for appellees.

COULSON, Justice.

This is an appeal from a proceeding to determine heirship and to remove an administratrix. The appellant Mary Nell Davis (Mary), the widow of the deceased, Charles Mason Davis, is joined on appeal by her minor children, Charles Delary Davis and Bessie Nell Davis, and by the adult children of the deceased by a prior marriage, Beverly Nell Davis Lange and Lawrence Riley Davis. Nancy Kway Davis (Nancy) and her minor child by the deceased, Nancy Melissa Davis, are appellees. The district court, after a trial de novo on appeal from the county court, refused to remove Nancy as administratrix and held her to be the putative wife of the deceased. The trial court also held that Bessie Nell Davis, Mary's second child, was not the daughter of the deceased.

The primary question is the validity of the Lord Mansfield rule.

Charles Mason Davis originally married in 1951, and Beverly Nell Davis Lange and Lawrence Riley Davis are the children of this marriage. This first marriage was terminated by divorce in 1965. In 1966 Charles Davis married a second time. This marriage terminated in divorce in 1967, and he married Mary in the same year. Charles Delary Davis was born in 1967. After entering the third marriage, the deceased worked on off-shore oil rigs in South America, and he went to Australia in 1967 to do similar work for the Reading & Bates Offshore Drilling Company. In 1968 he was transferred to Singapore. On October 2, 1968, the deceased engaged in a Buddhist wedding ceremony with Nancy and signed a Chinese marriage contract. They lived together as husband and wife in Singapore. Sometime after this marriage ceremony, a copy of Mary's divorce petition arrived at the couple's apartment in Singapore (the divorce was never prosecuted to completion). Charles Mason Davis drowned as a result of a ship collision in the Sea of Java on December 24, 1970. Approximately one month later, Nancy Melissa Davis was born to Nancy, and Bessie Nell Davis was born to Mary.

The deceased (who died intestate) left a $50,000 life insurance policy with his estate named as beneficiary, as well as $1,399.88 in wages and a boat and motor. Nancy was appointed administratrix in Chambers County and (two weeks later) Mary was appointed administratrix in Liberty County.

Nancy and Mary each plead that she was the legal wife of the deceased. At trial the personnel manager of Reading & Bates testified from office records that the deceased had worked for the company in Australia, Singapore, and Iran. The manager also stated that the deceased usually worked in shifts of two weeks on an oil rig and one week off, and that the company's records would not necessarily indicate any trip back to the United States in the deceased's free time. Mary testified, over the objection of her attorney, that she had not seen the deceased since 1969. Nancy testified, over appellants' objection on the basis of the Dead Man's Statute, that the deceased had told her he was divorced before their marriage. Nancy also stated that she learned of Mary's divorce proceeding during her own marriage. The father and step-mother of the deceased testi-

fied that, as far as they knew, the deceased was last in the United States in December, 1969.

Appellants introduced a copy of the laws of the Republic of Singapore, specifically the "Women's Charter" which they asserted to be Singapore's code regulating marriage. Appellants demonstrated that the Singapore marriage violated this code in numerous respects. A document from the Registrar of Marriages in Singapore stated that Nancy's marriage had never been registered. The parties stipulated that a search of the records of the State of Queensland, Australia, failed to show any divorce granted to the deceased during the appropriate time period. A certificate from the registrar of records in Singapore was admitted stating that no divorce was granted to the deceased there.

The trial court held that Mary was the legal widow of the deceased and that Nancy was the putative wife, because she had acted in good faith at all times and was "ignorant of the fact that the said Charles Mason Davis was legally married to Mary Nell Davis." The court also found that Bessie Nell Davis was not the daughter of the deceased. The court held Mary's application to remove Nancy as administratrix to be a collateral attack and denied the request. The court awarded one-half of the estate to Nancy, one-quarter to Mary, and the final one-quarter in equal shares to the two children of the deceased's first marriage, Mary's first child, and Nancy's child. The boat and motor was held to be separate property, and an undivided one-third interest went to Mary with the four children receiving undivided one-sixth interests each.

Appellants argue that Nancy never had a valid ceremonial marriage with the deceased and that, even if she had, her good faith was destroyed when she received the copy of the divorce petition. They also assert that, when the Lord Mansfield rule is applied and all the incompetent testimony stricken, there is no evidence or insuffi-

cient evidence to overcome the presumption of legitimacy of Mary's second child. Appellees assert that Nancy's marriage was a valid legal marriage, that the presumption that a divorce was obtained in support of the last legal marriage was not rebutted, and that Nancy was not sufficiently apprised of Mary's marriage to destroy Nancy's good faith. Appellees also challenge the Lord Mansfield rule as a violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The parties agree that Section 42 of the Probate Code, V.A.T.S., legitimates Nancy's child whether the marriage is now held valid or not. [Tex.Prob.Code Ann. sec. 42 (1956) provides in pertinent part: "The issue of marriages deemed null in law shall nevertheless be legitimate."]

■ Two procedural points which greatly simplify the issues here must be addressed. First, the appellees wish to rely upon the presumption that an appellate court must assume that the trial court found all fact issues having support in the evidence in favor of the judgment in the absence of findings of fact. However, the trial court's judgment itself contains specific findings of fact and specific conclusions of law separately grouped. The fact that findings and conclusions under Rule 296, Texas Rules of Civil Procedure, are not filed separately from the judgment does not effect their validity. City of Dallas v. Haworth, 218 S.W.2d 264 (Tex.Civ. App.—Dallas 1949, writ ref'd n. r. e.).

■ The second procedural point is that the appellees cannot now complain for the first time by cross-point that the trial judge erred in not finding that Nancy had a legal, rather than putative, marriage. In a trial before the court, a motion for new trial is not required as an appellate predicate by Rule 324, Tex.R.Civ.P., and an appellee may present cross-points even though he has not perfected his appeal. However, when an appellee in a judge-tried case has not excepted to the judgment, given notice of appeal, or apprised

the trial judge in any way of his dissatisfaction, his cross-points must be overruled. Security Insurance Co. v. Pioneer Casualty Co., 449 S.W.2d 158 (Tex.Civ.App.—Houston [1st Dist.] 1969, writ ref'd n. r. e.); Maloney v. Strain, 410 S.W.2d 650 (Tex. Civ.App.—Eastland 1966, no writ). In the instant case, the appellees could have tendered alternate findings of fact to the effect that Nancy had a legal marriage. Since the appellees cannot now argue that Nancy had a legal rather than a putative marriage, they cannot rely on the presumption that a divorce was obtained before the later legal marriage. [The common law presumption is now codified. Tex.Fam. Code Ann. § 2.01, V.T.C.A. (1973)]. Similarly, the appellees' argument that Mary never had a legal marriage with the deceased despite the trial judge's finding has been waived.

Appellants assert that a putative marriage can never exist absent a marriage ceremony attended by all the formalities prescribed by the law of the place of the ceremony. In re Greathouse's Estate, 184 S.W.2d 317 (Tex.Civ.App.—San Antonio 1944, no writ). Since the appellants allege that they have proven the applicable law of Singapore and that Nancy's ceremony was in violation of it, they contend she never had a putative marriage. The more equitable doctrine would seem to be that a ceremony in disregard of the prescribed formalities merely destroys the presumption of good faith, upon which the wife could otherwise rely, rather than the putative marriage itself. O. Speer, Marital Rights in Texas § 51 (4th ed. 1961). However, in the view we take of this case, Nancy's good faith at the inception of her marriage is irrelevant.

 A putative marriage is one in which one or both of the spouses enter into in good faith, but is invalid because of an existing impediment. The impediment is typically a prior and continuing marriage by one of the spouses. A putative marriage exists only for so long as the one good-faith spouse remains in ignorance of the impediment. Curtin v. State, 155 Tex.Cr. R. 625, 238 S.W.2d 187 (1951); United States Fidelity & Guaranty Co. v. Henderson, 53 S.W.2d 811 (Tex.Civ.App.—Amarillo 1932, no writ). This rule is required by the very definition of putative marriage, because the lack of good faith on the part of both parties means that the relationship continues as meretricious. The issue in the instant case is what type of notice constitutes knowledge of the impediment on the part of the good-faith spouse.

 On the cross-examination of Nancy by the appellants' lawyer, the following colloquy occurred:

Q: Now, during—well—subsequent to April 2, 1968 and before December 24, 1970, you learned, did you not, that Mary Nell Davis was trying to get a divorce from Charles Davis?

A: I didn't learn nothing of that.

Q: Well, you remember you [sic] asking that question on your deposition?

A: You asking me whether I received—

Q: No ma'am, I didn't ask you if you received it. I asked you if you learned that Mary Nell Davis was trying to get a divorce from Charles?

A: I learned it.

Appellants assert that this testimony establishes that Nancy was put on reasonable notice of the prior marriage and was thereafter negligent in failing to ascertain the true facts, citing Walker v. Walker's Estate, 136 S.W. 1145 (Tex.Civ.App.—1911, writ ref'd). That case is inapplicable here, because it held that a woman could not rely solely upon the statement of her husband that he had obtained a divorce when her husband and the court records were in the town in which she resided. The court refused to allow her to predicate her good faith on entering into an alleged putative marriage upon a cavalier disregard of whether she was actually divorced

when the facts were readily available to her. Appellees rely upon Smith v. Smith, 1 Tex. 621 (1846), in which the Supreme Court said in dictum that "certain" knowledge of the impediment was required to terminate the good faith of the putative spouse. Appellees argue that to say Nancy had actual knowledge of the impediment would be to hold that a good-faith party to a putative marriage must rely upon the representation of a stranger to the marriage, which may be based upon a mistake of fact or law. We disagree. Here Nancy was, in effect, informed by the deceased's legal wife that she was still attempting to obtain a divorce. We hold that, when a third party who is in a position to know whether there is a prior and continuing marriage apprises the good-faith spouse of a putative marriage of facts which can only be consistent with the impediment, the spouse has "certain" knowledge of the impediment, and the spouse's good faith is at an end. By her own testimony, Nancy had such knowledge, and both her good faith and her putative marriage were thereby terminated before her husband's death.

The second problem in this case is whether the trial judge correctly found that Mary's second child was not the child of the deceased. The appellants initially assert that Nancy and her child have no standing to challenge the legitimacy of Mary's child. Byrd v. Travelers Insurance Company, 275 S.W.2d 861 (Tex.Civ.App.—San Antonio 1955, writ ref'd n.r.e.), is cited for the proposition that only the husband of a woman to whom a child is born during a legal marriage has standing to contest the child's legitimacy. However, the holding in the Byrd case is actually the much narrower one that, if a husband expressly or tacitly renounces his right to bastardize a child, then the right is extinguished. Nancy's child has standing here, because each additional child who shares in the estate must reduce the share of Nancy's child proportionately.

The appellants' second argument in regard to legitimacy is that Mary's child is entitled to rely on one of the strongest presumptions known to the common law, that a child born during a legal marriage is presumed to be the legitimate child of the husband and wife. This presumption can be rebutted only by clear and convincing evidence of non-access. Pinkard v. Pinkard, 252 S.W. 265 (Tex.Civ.App.—Beaumont 1923, no writ). The evidence must establish an impossibility of access at the time of conception. Lawson v. Baker, 351 S.W.2d 571 (Tex.Civ.App.—Houston 1961, no writ). Appellants assert that, when all the incompetent and inadmissible testimony is disregarded in this case, there is either no evidence or insufficient evidence to rebut this presumption and to sustain the finding that Mary's second child was not the daughter of the deceased.

Absent Mary's testimony that she had not seen her husband since 1969, this Court would have to sustain her point of error that the evidence is insufficient to uphold the trial court's finding as to her second child. The deceased's father and stepmother both testified that, "as far as I know," Charles was last in the United States in 1969. This type of testimony has been characterized as "mere surmise" and is wholly without probative value. Lawson v. Baker, *supra*. The deceased's passport was introduced as an exhibit. However, it was on the deceased's person when he drowned, and its waterlogged condition renders it illegible. The personnel manager from Reading & Bates stated that his records did not indicate a trip to the United States during any of the deceased's one-week off-duty periods, but he continued that his records would not necessarily reflect such a trip. Nancy's testimony that Charles' last visit to the United States was in 1969 can be given little, if any, weight, for two reasons. Assuming *arguendo* that her testimony was not in violation of the Dead Man's Statute, Vernon's Tex.Rev.Civ. Stat.Ann. art 3716 (1926), her statement is hardly more than the "mere surmise" of

the deceased's father and step-mother, because Charles was admittedly away from their home in Singapore for weeks at a time. Secondly, her statement is of no aid in the determination of whether Mary ever left the United States to meet Charles.

The only direct and conclusive evidence on the issue of non-access was the testimony of Mary herself, when she stated that she last saw Charles in 1969 (her second child was born in 1971). The appellants contend that this statement was wholly inadmissible under the rule of Lord Mansfield. The appellees argue that this rule is a violation of Nancy's child's Fourteenth Amendment rights of due process and equal protection. Since Lord Mansfield's rule is judge-made law involving no statute, we believe that the question of its application can be addressed without reaching the constitutional aspects of the issue.

In 1777 Lord Mansfield (in dictum) stated in Goodright v. Moss, 98 Eng.Rep. 1257 (K.B.1777):

> The law of England is clear, that the declarations of a father or mother cannot be admitted to bastardize the issue. . . . As to the time of birth, the father and mother are the most proper witnesses to prove it. But it is a rule founded on decency, morality and policy that they shall not be permitted to say after marriage that they had no connection and therefore that the off-spring is spurious.

Lord Mansfield's rule has been uniformly and unquestioningly applied as the common law of Texas since the nineteenth century, although the Texas Supreme Court has never spoken to it. In 1923 Dean Wigmore initiated a reconsideration of the rule in the United States by his blistering criticism of it. 4 Wigmore, Evidence §§ 2063, 2064 (2d ed.). (Lord Mansfield's rule was abolished in its homeland by Parliament.

Matrimonial Causes Act 1965, s. 43.) Wigmore stated that the reasons for the rule are wholly without merit, because there never was any indecency in asking whether spouses were separated at a particular time and any "immorality" may be proved in a wide variety of other ways. Dean Wigmore's attack led many state courts to abolish Lord Mansfield's rule. Annot., 49 A.L.R.3d 258 (1973). The rule in Texas has long been characterized by commentators as "without justification" and "unsound." 1 C. McCormick & R. Ray, Texas Evidence § 90 (2d ed. 1956); 8 Texas L.Rev. 587 (1930).

Lord Mansfield's rule has twice survived frontal assault in the appellate courts of Texas. In Gonzalez v. Gonzalez, 177 S. W.2d 328 (Tex.Civ.App.—El Paso 1943, no writ), the court rejected the idea that Article 4633, Tex.Rev.Civ.Stat.Ann. (1960), which authorizes a husband and wife to testify against each other in divorce suits, abrogated the Mansfield rule in regard to divorce cases. In Barnett v. Barnett, 451 S.W.2d 939 (Tex.Civ.App.—Beaumont 1970, writ dism'd), an attempt was made to introduce hospital records containing statements made by the mother which tended to show non-access. The court held that, since the mother's original statements violated the Mansfield rule, the hospital records must be similarly inadmissible. After noting Dean Wigmore's criticism, the court stated:

> [T]he rule has survived nearly two centuries of criticism by the scholars and legal writers on the subject and is firmly embedded in the jurisprudence of Texas. We will leave to the scholars any further assaults upon the rule.

While we agree that Lord Mansfield's rule has heretofore been firmly ensconced in Texas, this Court cannot subscribe to the position that a rule without any foundation in reason must be blindly applied [1] by the

---

1. In Esparza v. Esparza, 382 S.W.2d 162 (Tex.Civ.App.—Corpus Christi 1964, no writ), the Mansfield rule was invoked to permit the actual father of the children to escape child support payments, despite the fact that the children were either legitimate by their mother's first marriage or by her marriage after their birth to their father.

courts out of mere habit and fruitlessly attacked by the scholars without hope of success.

■ The Lord Mansfield rule is an absolute exclusionary rule of evidence which bars from the courtroom the best evidence of a fact in issue. It is a corollary to the necessary and salutory presumption that a child born during the pendency of a legal marriage is the legitimate offspring of the husband and wife. However, the only reasons ever advanced for the Mansfield rule are those of the Lord Chancellor himself, the public policy grounds of "decency" and "morality." But as Dean Wigmore observed half a century ago, there was never any indecency in examining a wife as to what periods of time she was separated from her spouse. Nor was it immoral for her to be so separated. If such testimony must necessarily connote adultery on her part, then it cannot be said that the common law has otherwise closed its eyes to this fact of life. It cannot be doubted that a mother's testimony which tends to bastardize her own child is unseemly, but to foreclose this testimony on that ground is circuitous—the issue *is* the child's legitimacy. Surely it is even more unseemly for a stranger to an estate to inherit because of a court-condoned suppression of evidence. If the function of a court is to find the truth of a matter so that justice might be done, then a rule which absolutely excludes the best possible evidence of a matter in issue rather than allow it to be weighed by the trier of fact must necessarily lead to injustice. Further, when a court voluntarily blindfolds itself to what every citizen can see, the public must justifiably question the administration of law to just that extent. Therefore, this Court declines to follow the Lord Mansfield rule.

Because of the antiquity and wide acceptance of the Mansfield rule, a note on judicial philosophy and stare decisis is in order. Normally this Court would feel compelled to follow a common law rule which had been recognized and applied by most, if not all, of our fellow courts of

civil appeals. However, two factors bear on the problem here which, in conjunction, necessitate a seemingly revoluntionary step. First, as discussed above, there is no rationale for the rule rather than some slight reason with which we might merely disagree. Second, the rule is an absolute exclusionary rule of evidence which bars the best possible evidence; if the rule excluded, in some circumstances, evidence which was merely relevant, then it would be much less odious. The confluence of these factors compels the reexamination of a rule which might otherwise command passive acceptance.

■ Because of the holding on the Mansfield rule, this Court has *sua sponte* examined the legal representation of Bessie Nell Davis, the second child of Mary. Mary was appointed the guardian ad litem for Bessie Nell Davis, and Mary's attorney represented both Mary and her children at trial and on appeal. Tex.Prob.Code Ann. § 376 (1956) provides in part: "Where there are minors . . . having no guardian in this state, who are entitled to a portion of an estate, or whose guardians also have an interest in the estate, the court shall appoint a guardian ad litem to represent such minors." The appointment of Mary as guardian ad litem for her daughter violated the clearest implication of this section by appointing the most ineligible person possible. However, there was no actual conflict of interest between Mary and her daughter. If the funds inherited by any minor child of Mary and put into a trust might be accessible to Mary in the future, then Mary stood to gain by the recognition of her daughter as an heir of the deceased, because two-fifths of the children's portion would be available to her rather than one-fourth. Section 376 is mandatory, but since an appointment was made, albeit the wrong one, fundamental error was not committed when no actual conflict existed. Newman v. King, 433 S.W.2d 420 (Tex. Sup.1968), involved the failure to appoint a guardian ad litem in a change-of-name proceeding, despite the mandatory language

of a statute requiring such an appointment when the minor's next friend appeared to have an interest "adverse to the minor." Chief Justice Calvert held that, while the failure to appoint was an error, fundamental error was not committed as the interest of the public generally was not adversely affected and the trial court was not deprived of jurisdiction. The Newman case is analogous to the instant case on the point of fundamental error, because the appointment below, in the absence of actual conflict of interest, does not adversely affect the public.

 Appellants' final point of error is that the district judge erred in refusing to remove Nancy as administratrix. The judgment of the district court recites that appellants' application to remove Nancy was a collateral attack. Appellees assert that this finding was correct, based upon Pure Oil Co. v. Reece, 124 Tex. 476, 78 S. W.2d 932 (Tex.Comm'n App. 1935, opinion adopted). There the Court held that the failure to include the sureties on a bond as parties in a bill of review proceeding seeking to remove a guardian made the attack collateral. The appellants below also failed to include the surety on Nancy's bond as a party in their application for removal. However, the Court in the Reece case stated that the reason the attack was collateral was because the bondsmen could be affected by the judgment and yet they were not included as parties. The bondsman in our case could not have been so affected. The county court judgment specifically declares (at the joint request and agreement of the parties) that the entire estate is to be placed in a savings account drawable only by court order, and the appellants' notice of appeal is recited in the judgment. The judgment of the district court also recites that notice of appeal has been given. Therefore, this Court can say with confidence that none of the funds in the savings account have been withdrawn. Since no funds have been withdrawn under Nancy's administration, her bondsman would not be affected by a judgment removing her as administratrix. This makes appellants' attack direct rather than collateral, unlike the Reece case in which the guardian had sold the minor's interest in a piece of land and had given a guardianship deed. Viewed as a direct attack in light of this Court's opinion, appellants' application to remove Nancy as administratrix must be successful, because she is a nonresident alien who is neither the legal nor putative widow of the deceased.

The judgment is reformed and affirmed. Nancy Kway Davis takes nothing. Mary Nell Davis takes an undivided one-half of the estate of Charles Mason Davis. Beverly Nell Lange, Lawrence Riley Davis, Charles Delary Davis, and Nancy Melissa Davis each take an undivided one-eighth interest. The trial court's award of the separate property is affirmed. Nancy Kway Davis is hereby removed as administratrix.